TIE COMMUNICATIONS, INC. *v.* ROBERT KOPP ET AL.
(14176)

PETERS, C. J., SHEA, CALLAHAN, GLASS and COVELLO, Js.

Argued February 20—decision released April 9, 1991

*Patrick W. Boatman,* with whom, on the brief, was *John H. Grasso,* for the appellant-appellee (named defendant).

*J. Patrick Ovington,* with whom, on the brief, was *George C. Springer, Jr.,* for the appellee-appellant (plaintiff).

SHEA, J. This case involves an appeal and cross appeal from a trial court's order regarding a prejudgment remedy. The plaintiff, TIE Communications, Inc. (TIE), sought such a remedy incident to its action against Integrated Power Technology, Inc. (IPT), Robert J. Kopp, IPT's president and sole shareholder (Kopp), and Kopp's wife, Elizabeth Kopp, the owner of the Kopps' family home. The Superior Court, *Hartmere, J.,* granted TIE an ex parte prejudgment remedy against all three defendants in the amount of $1,783,361.[1] As part of the prejudgment remedy, the court gave TIE authorization to attach the Kopps'

---

[1] IPT's assets had previously been acquired by Citytrust, IPT's primary secured creditor. The prejudgment remedy against IPT authorized garnishment of IPT's only remaining assets, sums owed IPT by its own debtors.

family home on the basis of TIE's allegation that Kopp had fraudulently transferred his interest therein to his wife. The Kopps thereafter moved to dissolve the attachment.[2] After a probable cause hearing, the Superior Court, *Fuller, J.,* dissolved the attachment of the Kopps' family home, finding that prior to the commencement of the action, Kopp had conveyed his interest in his home to his wife for good and adequate consideration. It also found, however, that TIE had shown probable cause for its complaint against Kopp, and therefore sustained the order of attachment against Kopp, but reduced its amount to $200,000. In addition, the trial court ordered Kopp to disclose his own assets to the extent necessary to satisfy the reduced attachment. TIE and Kopp each appealed.

The following facts are relevant to the issues before us. Kopp is the sole shareholder and president of IPT, which he purchased in 1986 from TIE. TIE sells long-distance telephone systems, for which IPT manufactures power supplies and performs engineering work. TIE is IPT's biggest customer.

Even before Kopp bought IPT, IPT (then Harmer Simmons Power Supplies) owed TIE over one million dollars. Subsequently, Kopp and IPT entered into several additional financial arrangements with TIE whereby TIE gave security to and eventually paid IPT's creditors in exchange for guarantees of repayment. In one such arrangement, TIE in 1987 gave IPT a letter of credit in the amount of $250,000, which IPT used as collateral for credit with its banker, Citytrust. Kopp and IPT in return provided TIE with reimbursement and indemnification agreements, the first dated October 20, 1987, and the second dated March 17, 1988. By

---

[2] IPT did not move to dissolve the prejudgment remedy attachment filed against it. The trial court indicated that it had not been asked to consider the validity of the garnishment against IPT's debtors.

these agreements, Kopp became personally obligated to TIE for certain IPT obligations.

When IPT defaulted on its debts to Citytrust, Citytrust in August, 1988, drew on the letter of credit; thus, TIE in effect paid IPT's debt to Citytrust to the extent of $250,000. TIE, IPT and Kopp then entered into an agreement on September 9, 1988, which the trial court found was intended to reimburse TIE for its payment of the debt to Citytrust.[3]

---

[3] The September 9, 1988 agreement contained the following relevant provisions: "WHEREAS, TIE has assisted IPT by obtaining a letter of credit in favor of Citytrust in the amount of $250,000 to secure certain indebtedness of IPT (the 'Letter of Credit'); and

"WHEREAS, by a Reimbursement and Indemnification Agreement dated as of October 20, 1987 and a Reimbursement and Indemnification Agreement dated as of March 17, 1988 (the 'Indemnity Agreements'), IPT and Kopp, jointly and severally, agreed to immediately reimburse TIE for any and all losses, liabilities and expenses incurred by TIE in connection with, or as a result of, the issuance of the Letter of Credit; and

"WHEREAS, by draft dated August 30, 1988, Citytrust has drawn the full amount of the Letter of Credit upon the assertion that IPT has defaulted on the indebtedness secured by the Letter of Credit; and

"WHEREAS, IPT and Kopp wish to make certain accommodations for the benefit of TIE in partial satisfaction of their obligations under the Indemnity Agreements (the 'Obligations') to reimburse TIE in the amount of $250,000.

"NOW, THEREFORE, the parties hereto agree as follows . . .

"2. TIE shall have no obligation to make any payment to IPT for or in connection with those engineering services and technical documentation heretofore provided by IPT to TIE with respect to power supplies produced by IPT for TIE, and all obligations of TIE to IPT with respect to or in connection with such engineering services and documentation are hereby deemed satisfied. The provisions of this paragraph 2 shall constitute satisfaction of the Obligations to the extent of $80,000. . . .

"6. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and there are no other understandings or agreements between them whether oral or written. . . .

"8. Subject to the satisfaction of all of the Obligations pursuant to the terms of this Agreement, this Agreement supersedes and replaces the Indemnity Agreements."

In addition to the language in paragraph 2, the September 9, 1988 agreement set forth other means by which IPT could recompense TIE for the $250,000 letter of credit, e.g., discounts on future services.

In an earlier financial arrangement, TIE had guaranteed IPT's obligation to make payments on certain leases entered into before IPT was purchased by Kopp in 1986. TIE claimed that it had been obliged to make some of the lease payments in 1988 and 1989 in amounts totaling $99,579. It contended that repayment of these sums was governed by certain provisions of the March 17, 1988 agreement between Kopp, IPT and TIE, which had also dealt with the $250,000 letter of credit.[4]

---

[4] The March 17, 1988 agreement contained the following relevant provisions: "WHEREAS, IPT and Kopp have requested that TIE assist IPT in obtaining financial accommodations by: (i) extending certain inventory purchase commitments to Citytrust to collateralize certain indebtedness of IPT; (ii) obtaining or renewing a letter of credit in favor of Citytrust in the amount of $250,000 to secure certain indebtedness of IPT; and (iii) providing such other assistance as may be requested by IPT or Kopp (the 'Financial Assistance'); and

"WHEREAS, in connection with the issuance of the Financial Assistance TIE will incur certain liabilities and expenses; and . . .

"WHEREAS, TIE is willing to assist IPT in obtaining financial accommodations and to provide Financial Assistance only if IPT and Kopp each agree to reimburse TIE for any and all liabilities and expenses incurred by TIE in connection with the Financial Assistance and to indemnify TIE in accordance with the terms of this Agreement; and

"WHEREAS, IPT and Kopp have each agreed to reimburse TIE for any and all liabilities and expenses incurred by TIE in connection with the provision of Financial Assistance.

"NOW, THEREFORE, the parties hereto agree as follows:

"1. IPT and Kopp, jointly and severally, hereby agree to immediately reimburse TIE for any and all losses, liabilities and expenses incurred by TIE in connection with, or as a result of, the provision of Financial Assistance.

"2. IPT and Kopp each hereby waive notice of . . . changes in terms or extensions of time of payment, the taking and releasing of collateral or guaranties, and the settlement, compromise, amendment, alteration or release of any of the obligations of IPT and Kopp under this Agreement (the 'Obligations'), and agree that, as to each of them, the amount of the Obligations shall not be diminished by any of the foregoing. . . .

"In the event any claim or action, or action on any judgment, based on this Agreement is made or brought against either IPT or Kopp or both, IPT and Kopp each agree not to deduct, set off or seek to counterclaim for, or recoup any, amounts which are or may be owed by TIE to it or him, respectively."

TIE's complaint against the Kopps alleged, in the first count, a breach by Robert Kopp of the reimbursement and indemnity agreements of October 20, 1987, and March 17, 1988, and, in the second and third counts, a fraudulent conveyance by him to his wife of his interest in the family home. In response to the first count, Kopp raised five special defenses, most notably payment, accord and satisfaction based upon paragraph 8 of the September 9, 1988 agreement. In essence, Kopp claimed that the September 9, 1988 agreement wiped the slate clean with respect to every antecedent obligation he owed to TIE.

At the hearing on the prejudgment remedy, TIE's witness, James Wacker, a vice president and former comptroller of TIE, testified that in order to assist IPT financially, TIE had assigned three research and development projects for IPT to perform on its behalf. One such task was the "Morgan power supply" development project. IPT's task was to research and develop the "Morgan power supply" and provide TIE with a "documentation page" that would allow TIE to send the product out to subcontractors for manufacturing. The value of this project was approximately $80,000. The parties agreed that paragraph 2 of the September 9, 1988 agreement related to the Morgan power supply job. In substance, this paragraph appeared to settle TIE's debt to IPT for the Morgan power supply engineering and documentation in exchange for an $80,000 credit against the $250,000 debt that IPT, and Kopp as IPT's guarantor, owed TIE for honoring the letter of credit. Wacker testified, however, that, although paragraph 2 used the terms "engineering services and technical documentation *heretofore provided*" (emphasis added), IPT had *not* provided a satisfactory documentation page for that project prior to September 9, 1988, and thus, by inference, that despite the

September 9, 1988 agreement, $80,000 of the $250,000 letter of credit remained unpaid.

The trial court found that the evidence was conflicting as to whether all of the terms of the September 9, 1988 agreement, particularly paragraph 2, had been complied with, "which would in effect discharge Robert Kopp from his obligations under the two prior agreements." The court found probable cause to conclude that $80,000 was still due under the letter of credit and that the $99,579 in lease payments made by TIE was guaranteed by Kopp under those terms of the March 17, 1988 agreement that were not superseded by the September 9, 1988 agreement. It therefore sustained the prejudgment remedy against Kopp but reduced it to $200,000, representing the $80,000 still allegedly owing for reimbursement of the letter of credit payment, the $99,579 in lease payments, and an allowance for possible interest.

I

"At the outset, we note the limited role that our case law assigns to appellate review of a trial court's broad discretion to deny or grant a prejudgment remedy. It is the trial court that must determine, in light of its assessment of the legal issues and the credibility of the witnesses, whether a plaintiff has sustained the burden of showing probable cause to sustain the validity of its claim. We decide only whether the determination of the trial court constituted clear error." *Greenberg, Rhein & Margolis, Inc.* v. *Norris-Faye Horton Enterprises, Inc.*, 218 Conn. 162, 166, 588 A.2d 185 (1991).

In his appeal, Kopp first claims that the trial court improperly allowed Wacker to testify that IPT had not fully performed the Morgan power supply project. He bases his objection on the parol evidence rule, which prohibits the use of extrinsic evidence to vary or con-

tradict the terms of an integrated written contract. See 3 A. Corbin, Contracts § 573; 4 S. Williston, Contracts (3d Ed.) § 631; General Statutes § 42a-2-202 (Uniform Commercial Code).

As we have so often noted, the parol evidence rule is not a rule of evidence, but a substantive rule of contract law. *Security Equities* v. *Giamba,* 210 Conn. 71, 77–78, 553 A.2d 1135 (1989); *Damora* v. *Christ-Janer,* 184 Conn. 109, 113, 441 A.2d 61 (1981); *Cohn* v. *Dunn,* 111 Conn. 342, 346, 149 A. 851 (1930); see also 2 Restatement (Second), Contracts § 213, comment (a); 3 A. Corbin, supra, § 573; 4 S. Williston, supra, § 631. The rule is premised upon the idea that "when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages [etc.], in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme." *Glendale Woolen Co.* v. *The Protection Ins. Co.,* 21 Conn. 19, 37 (1851).

The parol evidence rule does not of itself, therefore, forbid the presentation of "parol evidence," that is, evidence outside the four corners of the contract concerning matters governed by an integrated contract, but forbids only the *use* of such evidence *to vary or contradict the terms* of such a contract. Parol evidence offered solely to vary or contradict the written terms of an integrated contract is, therefore, legally irrelevant. When offered for that purpose, it is inadmissible not because it is parol evidence, but because it is irrelevant. By implication, such evidence may still be admissible if relevant "(1) to explain an ambiguity appearing

in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud." *Jay Realty, Inc.* v. *Ahearn Development Corporation,* 189 Conn. 52, 55–56, 453 A.2d 771 (1983). These recognized "exceptions" are, of course, only examples of situations where the evidence (1) does not vary or contradict the contract's terms, or (2) may be considered because the contract has been shown not to be integrated, or (3) tends to show that the contract should be defeated or altered on the equitable ground that "relief can be had against any deed or contract in writing founded in mistake or fraud." *Noble* v. *Comstock,* 3 Conn. 295, 299 (1820); see also *Dale* v. *Gear,* 38 Conn. 15, 18–19 (1871) (agency, trust, equitable relation or equity may be shown by parol evidence).

## A

At the hearing, Wacker's testimony was offered to explain the allegedly unclear language of paragraph 2 of the September 9, 1988 agreement. Kopp argues, however, that once the parties had agreed that paragraph 2 referred to work on the Morgan Power Supply project, the contract ceased to be ambiguous; thus, because it used the term "heretofore performed" in referring to that work, Wacker should not have been allowed to testify that the work in question had *not* been "heretofore performed."

In its memorandum of decision, the trial court stated: "The parties agree that the $80,000 item in paragraph two *relates to* engineering services that IPT was to supply, known as the Morgan power supply." (Emphasis added.) The hearing transcript demonstrates that the parties agreed to the subject matter of paragraph 2,

and to no more.[5] The meaning of the words "those engineering services and technical documentation heretofore provided," and their application in the context of the rest of paragraph 2, remained ambiguous.

---

[5] If, as Kopp urges, the particular designation "Morgan power supply" substitutes for the entire phrase, "those engineering services and technical documentation heretofore provided," paragraph 2 reads as follows: "TIE shall have no obligation to make any payment to IPT for or in connection with the Morgan power supply development project, and all obligations of TIE to IPT with respect to the Morgan power supply development project are hereby deemed satisfied." Thus, according to Kopp, paragraph 2 simply settles TIE's preexisting debt to IPT and requires no future performance. Thus, once IPT had satisfied its other obligations in the September 9, 1988 agreement, the agreement would extinguish Kopp's own obligations to TIE.

TIE conceded only that the subject matter of paragraph 2 was the Morgan power supply development project. If, however, we apply that concession so as to substitute "Morgan power supply" for the shorter phrase, "engineering services and technical documentation," paragraph 2 reads as follows: "TIE shall have no obligation to make any payment to IPT for or in connection with those engineering services and technical documentation that have been heretofore provided by IPT to TIE with respect to the Morgan power supply development project, and all obligations of TIE to IPT with respect to or in connection with the engineering services and technical documentation that were heretofore performed with respect to that project are hereby deemed satisfied." According to this reading, TIE no longer had to pay for any work IPT had done on the project, but the paragraph would not affect IPT's duty to perform, and TIE's duty to pay for, work unperformed as of September 9, 1988. Thus, if the trial court adopted TIE's interpretation of paragraph 2, any preexisting agreement between the parties with respect to work on the Morgan power supply project would be merged into and satisfied by the September 9, 1988 agreement only to the extent that the Morgan power supply project work had actually been performed prior to that date. To the extent that the Morgan power supply work had not been performed, the preexisting agreement would continue to govern. According to TIE, the project was one of the financial accommodations governed by the March 17, 1988 agreement, and guaranteed by Kopp personally, so that even if in theory the September 9, 1988 agreement credited $80,000 to IPT and Kopp on the letter of credit debt, Kopp would still be personally liable for the value of the never completed Morgan project. This would explain why TIE's complaint does not refer to the September 9, 1988 agreement: it would simply be irrelevant to the continued application of the earlier agreements upon which TIE's complaint is based.

The syntax of the paragraph made it unclear whether the disputed words "those . . . heretofore provided" were intended as an express acknowledgment that the Morgan power supply work had been completed, as an incidental statement that the Morgan power supply work had been completed, as a recital of consideration received, or as an implicit promise or condition precedent that the incomplete Morgan power supply work would be completed forthwith thereby triggering TIE's obligation to credit IPT and Kopp with $80,000 against the letter of credit debt. The trial court was entitled to consider evidence shedding light on that ambiguity, in which the court apparently perceived an implied promise or condition precedent that the work be completed before TIE could have any obligation to IPT that IPT could "deem satisfied." See generally 3 A. Corbin, supra, § 591 ("proof of fundamental assumption on which agreement is based").

B

Even had the trial court expressly adopted Kopp's contention that the words "heretofore provided" contain a factual assertion that IPT had in fact completed performance of its obligations on the Morgan power supply project,[6] the court would still have had valid grounds for admitting the challenged evidence. The parol evidence rule pertains to contract terms, not assertions of fact. "A recital of fact in an integrated agreement may be shown to be untrue." 2 Restatement (Second), Contracts § 218 (1). This is because "[a]n integrated agreement may have the effect of discharging a prior promise, conveyance or discharge; it does not establish fictitious events." Id., comment (a).

Typically, this principle permits a party to void a contract on the ground of lack of consideration despite the

---

[6] See footnote 5, supra.

recital within the contract of the consideration allegedly received. See id., comment (e); 3 A. Corbin, supra, § 586; E. Farnsworth, Contracts § 7.2, pp. 464–65; 1 S. Williston, supra, § 115B. A recitation of consideration received does not prevent proof that there was no such consideration. *Roe* v. *Jerome,* 18 Conn. 138, 164 (1846); *Raymond* v. *Sellick,* 10 Conn. 480, 483 (1835); 2 Restatement (Second), Contracts § 218, comment (e). It is simply prima facie evidence, shifting the burden of proof to the party disputing the consideration. *Taft Realty Corporation* v. *Yorkhaven Enterprises, Inc.,* 146 Conn. 338, 342, 150 A.2d 597 (1959); *Raymond* v. *Sellick,* supra; see also *Roe* v. *Jerome,* supra. If the recited consideration was never given, the court may either void the contract or imply a promise not explicitly stated. 2 Restatement (Second), Contracts § 218, comment (e). Thus: "A, an insurance company, issues a fire insurance policy to B. The policy provides that A is not bound until the premium is paid, and falsely recites payment. On accepting the policy, B impliedly promises to pay the premium and A is bound by the policy." Id., comment (e), illustration (2).

This case fits squarely within the Restatement illustration cited. Even if the contract stated unequivocally that the Morgan power supply project services had been "heretofore provided," TIE would have been entitled to show that the services in question had not been "heretofore provided" and that therefore IPT had an implied obligation to provide those services before the rest of the paragraph could take effect. See also *Vanoski* v. *Thomson,* 114 Idaho 381, 383, 757 P.2d 244 (Id. App. 1988); but see *Wade* v. *Ballard,* 69 Ga. App. 669, 671, 26 S.E.2d 542 (1943); *Caplan* v. *Saltzman,* 407 Pa. 250, 180 A.2d 240 (1962).[7]

---

[7] TIE was also entitled to present the offered evidence in order to show that IPT had practiced fraud in the inducement of the contract by misrepresenting that it had completely provided the engineering services and

## C

Kopp's second claim is that because Wacker's testimony was inadmissible, there was no evidence whatever from which the trial court could have found that there was probable cause to support the prejudgment remedy.

We have already decided that Wacker's testimony was admissible either to explain an ambiguity in paragraph 2 of the September 9, 1988 agreement, or to rebut a factual recitation contained in that agreement. The trial court's evaluation of the evidence shows that it would have reached the same result under either theory. In its decision, the court summarized: "The defendants claim [the Morgan power supply project] was delivered by them, and TIE claims it wasn't. There is insufficient evidence to resolve this dispute. Even though the defendants may prevail on this claim at trial, the court finds that there is evidence sufficient to meet the probable cause standard that $80,000 is still due under the letter of credit." This conclusion was reasonable and as such must survive the limited standard of review applicable to appeals from prejudgment reme-

documentation required by TIE in connection with the Morgan supply project. *Jay Realty, Inc.* v. *Ahearn Development Corporation,* 189 Conn. 52, 56, 453 A.2d 771 (1983); *Ursini* v. *Goldman,* 118 Conn. 554, 562, 173 A. 789 (1934); *McLaughlin* v. *Thomas,* 86 Conn. 252, 256–57, 85 A. 370 (1912); *Noble* v. *Comstock,* 3 Conn. 295, 299 (1820). Alternatively, Wacker's testimony could have supported a finding that TIE was operating under a unilateral mistake that the work had already been performed, which redounded to IPT's and Kopp's unconscionable advantage. *Geremia* v. *Boyarsky,* 107 Conn. 387, 390, 140 A. 749 (1928). TIE did not purport to offer the disputed testimony for either purpose, and the trial court did not rely upon these alternative theories in reaching its decision. Because we conclude that the evidence was properly admitted and applied by the trial court, we need not consider further these alternative grounds for its admissibility.

dies. *Greenberg, Rhein & Margolis, Inc.* v. *Norris-Faye Horton Enterprises, Inc.,* supra, 166.[8]

## II

TIE raises two issues in its cross appeal. First, it claims that the trial court should have granted its motion for disclosure of *IPT's* assets, especially since the bulk of Kopp's own assets were sums owed to him by IPT that IPT had not yet received from its own debtors. In fact, the trial court neither granted nor denied the motion, believing, on the basis of the parties' own assertions, that the prejudgment remedy against IPT was not before it. To the extent that the motion for disclosure of assets sought disclosure of *IPT's* assets, therefore, it remains pending on the Superior Court docket for a decision by the trial court and is not properly a subject of this appeal.

TIE also challenges the trial court's discharge of its attachment against the Kopp family home. TIE does not dispute the court's finding of fact in this proceeding that Kopp's sale of his half-interest in the family home to his wife for $55,000 in cash was for good and adequate consideration. It does not challenge, moreover, the finding that there was no probable cause to believe that Elizabeth Kopp participated in the sale with the intent to defraud Kopp's creditors, and thus no probable cause to sustain the attachment against her property. TIE claims instead that, because its claim of a fraudulent conveyance could not be resolved on the merits at a hearing on a prejudgment remedy; see *Augeri* v. *C.F. Wooding Co.,* 173 Conn. 426, 428, 378

---

[8] Kopp's third claim on appeal, challenging the trial court's order for disclosure of his assets in the amount of $200,000, is predicated entirely upon his contention that there was no evidence upon which the trial court could find probable cause that any of his obligations to TIE survived the September 9, 1988 agreement. Because we have already rejected that contention, we also affirm the trial court's order for disclosure of his assets.

A.2d 538 (1977); it might still be able to prove at trial that the transfer was a "fraudulent conveyance" and thus that Robert Kopp retained an equitable interest in the property. Because probable cause was found as to his liability to TIE based upon the guaranty agreements, TIE claims to be entitled to attach his undetermined and possibly nonexistent "interest" in the family home owned by his wife, even though no probable cause was found that his sale of that interest to his wife was a fraudulent conveyance.

TIE's argument is specious. Once the Kopps challenged the attachment, and the trial court had found, even at this preliminary proceeding, that the transfer to Elizabeth Kopp was for adequate consideration, and that there was no showing of fraudulent intent on her part; see *Tyers* v. *Coma*, 214 Conn. 8, 11, 570 A.2d 186 (1990);[9] Kopp *had* no attachable interest in the family home held in her name, and "saying doesn't make it so."

The attachment against the Kopps' family home was originally granted as an ex parte prejudgment remedy. Our statutes permit a prejudgment remedy, as defined in General Statutes § 52-278e (a), to be granted ex parte upon oath "(1) that the prejudgment remedy requested is for an attachment of real property; or (2) that there is reasonable likelihood that the defendant . . . (D) is about to fraudulently dispose of or has fraudulently disposed of any of his property with intent to hinder, delay or defraud his creditors . . . ." Thus, § 52-278e (a) permitted TIE to attach Robert Kopp's alleged "interest" in the property transferred to his wife based upon the sworn statement that there was a reasonable likelihood that he had "fraudulently disposed of his property," for, if he had done so, he would plainly have

---

[9] Interspousal transfers are not presumptively fraudulent. Cf. *Tyers* v. *Coma*, 214 Conn. 8, 11, 570 A.2d 186 (1990).

retained an attachable equitable interest in that property. *Denison Development Co.* v. *Gunther,* 189 Conn. 333, 334–35, 455 A.2d 1340 (1983). Insofar as the ex parte prejudgment remedy authorized attachment of the legal title to the property, it was permissible under § 52-278e (a) (1), because Elizabeth Kopp is a codefendant to this action.

We have previously held that § 52-278e (a) is saved from constitutional infirmity by the requirement that a requested probable cause hearing shall swiftly follow an ex parte attachment. *Ford Motor Credit Co.* v. *B.W. Beardsley, Inc.,* 208 Conn. 13, 17, 542 A.2d 1159 (1988); but see *Pinsky* v. *Duncan,* 907 F.2d 17 (2d Cir.), cert. granted sub nom. *Connecticut* v. *Doehr,* U.S. , 111 S. Ct. 42, 112 L. Ed. 2d 18 (1990). When an ex parte prejudgment remedy allows a plaintiff to cloud the marketable title of the real property of a third party, however, it has reached the outer limit of the constitutional stratosphere. Once a trial court has found there is no probable cause that the plaintiff will be able to prove the only legal claim linking the third party's property to the defendant, the plaintiff's statutory right to attach an interest in the third party's property must cease. To conclude otherwise would authorize a plaintiff to encumber anyone's property upon the wildest and most unfounded assertions of fraudulent conveyance. Such an attachment would violate the property owner's rights of due process under the fifth and fourteenth amendments to the United States constitution, and is not countenanced by any reasonable construction of our statute.

The judgment is affirmed.

In this opinion the other justices concurred.