[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiffs, Gertrude and Edward Bzdyra, have filed a complaint alleging that the defendants, Earl B. Johnston and William Pietras, breached a contract to build them a duplex house for $67,200 by ceasing work before completion of the house. They request damages for the cost of completion of house above the contract price plus interest.
The defendants deny breaching the contract claiming that the work was substantially finished before work ceased; that Gertrude Bzdyra barred the defendants and their workmen from the job site preventing completion; and that she failed to provide information necessary to complete the project and/or misrepresented the information she did provide. Further, the defendants allege in their amended counterclaim that she interfered with the progress of the construction by harassing the defendant's work crew by having her own workman perform work at the site simultaneously; she converted tools, equipment, and material belonging to the defendants; failed to pay the money owed under the contract; and failed to provide the defendants with the information needed to fulfill the contract. The defendants claim $20,000 damages plus interest, attorney's fees, punitive damages and treble damages. CT Page 9663
The plaintiffs deny the defendant's special defenses and counterclaim.
FACTS
In this memorandum because Edward Bzdyra played little or no role in the activities pertinent to the parties' claims the use of the word "plaintiff" is meant to refer to Gertrude Bzdyra unless otherwise indicated.
In late 1987 the plaintiffs desired to erect a duplex house on property they own on Dunn Road in Coventry. The plaintiff had built homes previously including two modular construction buildings. She was seeking estimates from modular home builders in early 1988 when she met defendant Johnston in a local restaurant. Upon learning of the plaintiff's plans, Johnston mentioned to her that he could construct a steel-frame structure at a better price than that of a comparable modular home. At that time neither Johnston nor the plaintiff had built a steel-frame house before. After some negotiations an agreement was reached, and a written contract drafted. Both plaintiffs and both defendants signed the contract on February 17, 1988 (Plaintiff's Exhibit A).
The plaintiff had been interested in a particular duplex, modular style house designed by Contempri Homes and known as "the Belmont." The plaintiff had contacted Alfred Lesperance, a modular home dealer, in late 1987 to discuss building the duplex house in this style. Lesperance supplied the plaintiff with the plans and specifications for the Belmont and quoted a price of $64,900 to the plaintiff.
Johnston told the plaintiff he could build the same style duplex but in a larger size. He also indicated that he wished to use the house as a display or model home to encourage prospective clients to buy steel-frame homes from him.
The first page of the contract with the defendants was drafted by Johnston and called for the construction of a thirty (30) feet by forty-four (44) feet, two story steel-frame, duplex house. The house was to be completed "per blueprint and specifications, and shall equal or exceed specifications of a similar two story duplex modular design provided by Mrs. Bzdyra." Attached to the contract, as pages 3 through 10, are the specifications for the Blemont design. These specifications were provided by the plaintiff and were the same as those given to her by Lesperance. CT Page 9664
Modular homes are not available with thirty (30) foot widths because the modules would be too wide to transport safely and legally by highway to the construction site. Thus, no modular homes with thirty (30) foot by forty-four (44) foot dimensions are designed or sold in the local area.
The contract recites the purchase price in two places. First, the contract specifies a total purchase price of "$65,000 plus extras, etc." Two paragraphs later the contract states that "the agreed upon purchase price shall [sic] $65,000 plus the equivalent increase in the final price quoted to Mrs. Bzdyra by the `Modular' company. It is agreed by both parties to this agreement that any requested extras shall be in addition to the basic price above." Again, these sentences were handwritten by Johnston in the spaces provided on a pre-printed form.
The contract also requires the plaintiffs to pay the defendants $13,000 as a down payment; to pay $20,000 to Tri-Steel Structures, Inc. upon delivery of the framing system to the building lot; and to pay the balance of the purchase price upon completion. The $13,000 down payment was made contemporaneously with the signing of the contract.
The first page of the contract also contains an "addendum" listing several modifications to the specifications attached to the agreement. A couple of weeks after the agreement was signed, the plaintiff consulted with Lesperance again inquiring as to what the total price of a Belmont style, modular duplex would be if the items listed in the addendum were added. Lesperance gave the plaintiff this new quote over the phone. He indicated that the new price would increase the cost to $67,200, or a difference of $2,200 above the previous quote of $65,000.
After the contract was signed but before construction began Johnston indicated to the plaintiff that he would credit her $5,000 if she advanced him $4,000 of the sum due upon completion because he needed the funds to help finance another project upon which he was engaged. The plaintiff agreed to advance him the money and did so on April 8, 1988.
Under the contract the plaintiffs were to construct the foundation and basement at their own expense except for the heating plant. The steel-frame duplex would be erected upon this foundation. After some initial difficulties immaterial to the resolution of the issues in this case, the foundation was poured. On May 23, 1988 the steel framing elements arrived, and the plaintiff paid $15,000 to Tri-Steel CT Page 9665 Structures, Inc. for the delivery as per the contract. But construction was delayed because Tri-Steel Structures Inc. delivered the incorrect size "I-beams". The correct I-beam was delivered on June 15, 1988, and construction of the duplex above the foundation commenced.
At about the time when the sheathing of the structure was occurring, the plaintiff orally conveyed the information in the new quote of $67,200, from Lesperance to Johnston. Construction continued during the summer of 1988 and into the fall.
During that fall Johnston approached the plaintiff and told her that he only had $2,000 left to pay toward the project and that she would have to advance him money for labor and materials if she wanted construction of the house completed. Johnston would then credit her with any sums so advanced at the time of closing. The plaintiff initially agreed and advanced several thousand dollars for payroll and materials.
By October 1988 the plaintiff realized that the money she had advanced already was approaching the full purchase price of $67,200, and the duplex was only half finished. On October 26, 1988, she informed Johnston of her decision to advance no more funds. For the most part, the defendants' crew ceased working on the house after this date.
At the time work ceased the shell of the duplex was completed, i.e. the frame of the structure was erected, sheathed, and the roof laid. The rough plumbing, including the installation of bathtubs, was finished. The vinyl siding was attached except for one-half of the back of the house and a portion of one end. The interior stud walls were partially erected. Two stairways were incomplete, and all the sheetrock, electrical, heating, finish plumbing, flooring, painting, interior carpentry work needed to be done. No fixtures, except the bathtubs, were installed.
The plaintiffs paid $46,091.90 to other contractors to finish construction. In addition, the plaintiffs, their son, and a hired carpenter worked approximately eight hundred (800) hours themselves to complete the house. The Court finds that these expenses were reasonable and necessary to complete construction of the duplex according to the contract specifications. The plaintiff's testimony in this regard was credible and corroborated by receipts, invoices, and time logs (Plaintiffs' Exhibits H through V).
Thus, the construction of the duplex cost the plaintiffs CT Page 9666 the following:
 Deposit $13,000.00 Advance before construction 4,000.00 Payment for steel delivery 15,000.00 Advances for labor during construction 4,072.99 Cost of material and labor to complete construction 46,091.90 ---------- Subtotal $82,164.89
In addition the Court finds that the plaintiffs were entitled to the following credits:
 Credit for $4000 advance $1,000.00 Credit for unpaid labor of plaintiffs at $10.00 per hour $7,992.50 --------- Total credit $8,992.50
Therefore, the total of costs to build the duplex plus credits owed equals $91,157.39.
The court also finds that the defendants ceased work at the job site because the plaintiff would no longer advance money for labor and materials. The Court also finds that the plaintiff did nothing to prevent the defendants or their men from completing the work at the site. Also, the Court finds that the plaintiff did not prevent the defendants from retrieving their tools, equipment, or unused materials, nor did she order the defendants or their crew not to return to the construction site. The lack of testimony by any member of the defendants' crew that the plaintiff interfered with or prevented them from working or barred them from the premises was significant and supports the plaintiff's version of events.
As to these issues the Court found the plaintiff's testimony credible and generally consistent. In contrast, the Court found Johnston's testimony in these areas to be evasive, contradictory, and generally improbable. Therefore, the Court finds that the defendants breached the contract and that the plaintiffs did not.
The question left to be reached is the crux of this lawsuit, viz. what was the contractually agreed upon purchase price? Both sides agree to the $65,000 starting figure. The plaintiffs assert that the clause "equivalent increase in the final price quoted to Mrs. Bzdyra by the `Modular' company" means the additional $2,200 contained in the second quote CT Page 9667 from Lesperance, which sum represents the increase in price generated by the modifications listed in the addendum. The defendants contend that the clause refers to some still unascertained figure which would represent the pro rata increase in price of a thirty (30) foot by forty-four (44) foot modular home in the Belmont style over a twenty-six (26) foot by forty-four (44) foot home.
LAW
The general rule in construing a written contract is that an unexpressed intent is of no legal significance, Collins v. Sears Roebuck Co., 164 Conn. 369 (1973) at p. 373. The parol evidence rule, which is a substantive and not merely evidentiary rule, forbids the Court from considering prior or contemporaneous conversations, circumstances, and usages in order to learn what was intended by the parties to a contract or to contradict what was written in the contract, TIE Communications, Inc. v. Kopp, 218 Conn. 281 (1991) at p. 288 and 289. However, parol evidence may be used to clarify an ambiguity; to prove the existence of a collateral agreement; to complete an incomplete document; or to show mistake or fraud, Ibid.
The plaintiffs contend that no exception to the parol evidence rule exists with respect to the contract in this case. The defendants on the other hand urge the court to consider evidence extrinsic to the contract because the clause in dispute is ambiguous. The Court agrees with the defendants that the meaning of this clause of the contract is unclear and requires some explication by evidence outside of the contract. Furthermore, that clause, by its own terms, calls for extrinsic information to complete the contract as to purchase price in that it requires the plaintiff to obtain and supply a quote from the modular company. The Court must determine the subject matter of that quote.
The Court has determined that this clause required the plaintiff to obtain, as she did, a new quote from Lesprance which quote would take into consideration the modifications to the specifications for the Belmont design listed in the "addendum" to the contract. This figure was $67,200, or $2,200 above the first quote of $65,000. The Court has reached this conclusion after a consideration of the following evidence and inferences.
Upon being informed orally by the plaintiff of the $67,200 figure, Johnston made no protest but rather continued work on the project for a period of some months. This inaction strongly indicates that he believed that the CT Page 9668 plaintiff had complied with the terms of the contract as to purchase price.
Lesperance testified that he did, indeed, receive a request for a second quote from the plaintiff asking him to re-evaluate his offer adding the items listed in the addendum to the contract. This request came in early 1988 before most, if not all, of the construction had taken place. This credible testimony supports the plaintiffs' position by demonstrating the plaintiff's perception of her duties shortly after the contract was signed.
Additionally, Lesperance recollected that, in an earlier conversation with the plaintiff, she related that she had found a steel-frame contractor who was willing to build the duplex with larger dimensions for the same price as the Belmont modular house which Lesperance had quoted. Again, this testimony confirms the plaintiffs' version of the final purchase price.
When the plaintiff applied for a building permit and in anticipation of constructing the duplex, she noted on the left-hand side of the permit form (Plaintiffs' Exhibit X) that the cost of construction would be $67,000 plus $20,000. She testified that the $67,000 amount was approximately the Lesperance quote and the $20,000 amount represented her estimation of the costs of construction not covered by the contract, viz. the costs of excavation, pouring the foundation, installing the well and septic system. The Court found this testimony believable and the mention of the $67,000 figure significant.
During cross-examination Johnston admitted that he was the party who, by the contract, was to bear the financial burden of building a thirty (30) foot by forty-four (44) foot structure for the twenty-six (26) foot by forty-four (44) foot price. The fact that Johnston wished to employ the duplex as a model home supplies the motivation for offering to build for a low price.
If the defendants' version of the clause "equivalent increase" conveyed the true intent of the parties at the time the contract was written, it would have been unnecessary to require the plaintiff to obtain a new quote from Lesperance. The parties could have simply calculated the dollar amount per square foot of the twenty-six (26) foot by forty-four (44) foot Belmont and multiplied this ratio by the increase in square footage for a thirty (30) foot by forty-four (44) foot structure. In fact, at trial, the defendants engaged in just this procedure (Defendants' Exhibit 9). The fact that CT Page 9669 this relatively simple and quick technique was not utilized casts doubt on the defendants' position and reinforces the plaintiff's.
Finally, in this case Johnston drafted the clause at issue. It is a basic rule of contract interpretation that when a term in the contract is capable of multiple meanings that term is to be construed against the drafter, Griswold v. Union Labor Life Ins., Co., 186 Conn. 507 (1982) at p. 513.
Therefore, the Court finds that the final purchase price for the duplex was $67,200 plus additional costs for certain changes. These change comprise ten (10) added hours of labor to move interior stud walls at the plaintiff's request; twelve (12) added hours of labor to level the foundation; and three (3) added hours of labor to install atrium doors in lieu of sliding doors. At $10.00 per hour these changes added $250 to the price for a grand total of $67,450.
The defendant's claim that the disparity between $67,200 and the ultimate cost of construction, viz. $23,524.40, is so great that the court ought to reform the contract by substituting their version of the clause to ascertain the final purchase price. It is not within the power of the court to make a new and different agreement, Robert Lawrence Associates, Inc. v. Del Vecchio, 178 Conn. 1 (1979) at p. 22. The construction and legal effect of the contract will not be varied by reason of inconvenience to the parties or unreasonableness of terms, Hatcho v. Corporation v. Della Pietra, 195 Conn. 18 (1985) at p. 21.
As a general rule contract damages are awarded to place the injured party in the same position as he would have been in had the contract been fully performed. This rule applies to cases of breach of contract in home construction, Bertozzi v. McCarthy, 164 Conn. 463 (1973) at p. 468.
The Court finds that the defendants breached the contract with the plaintiffs to build the duplex for $67,450 and finds for the plaintiffs on the complaint and the counterclaim. The Court awards damages as follows:
 Difference between actual costs $91,157.39 and contract price $67,450.00 ---------- Damages: $23,707.39
The Court declines to award interest in this case. "The determination of whether or not interest is to be recognized as a proper element of damage is one to be made in view of CT Page 9670 the demands of justice rather than through the application of any arbitrary rule," Ibid. In this case the damages were not liquidated until trial. A portion of the labor costs incurred by the plaintiffs was for labor performed by themselves or their son, and no money was actually paid out. The plaintiffs received the benefit of a low contract price because the duplex was to be a model home, but it cannot now be so employed. Under these circumstances the Court does not find that the detention of any fixed sum was wrongful.
HON. SAMUEL SFERRAZZA Superior Court Judge