[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
In this case, the defendants have moved for summary judgment claiming there are no genuine issues of material fact and that the defendants are entitled to judgment as a mater of law "because the plaintiffs claims under a contract for the purchase and sale of real estate were extinguished by the merger of the contract into the deed conveying said property to the defendants."
Giving the plaintiffs pleadings and affidavits every favorable inference, what appears to be the situation can be described in the following manner: the defendants signed a purchase and sale agreement in January, 2000. A schedule of the agreement states the purchase price was $448,326 and the "deposit paid" with the contract was $22,000. A section of the agreement provided that if the purchaser were to make certain selections during construction of the house as to "colors, fixtures and/or materials" resulting in additional charges "such charges shall be paid at the time of purchaser's selections." Such selections and changes were submitted in the amount of $6,560, which were paid by check prior to the closing. Mr. Barrows, a vice president for the plaintiff has submitted an affidavit which states that a closing for the conveyance of the property from the Pulte Home Corporation (Pulte) to the Appletons took place on July 6, 2000, and the settlement statement of that date "erroneously listed the deposit money as $28,560 instead of $22,000 because it mistakenly included the separate payments of $6,560 that were already paid outside of the closing transaction. Since the sales price remained at $448,326 without an adjustment, the seller received $6,560 less than the agreed price by contract on account of an erroneous deposit figure of $28,560." The plaintiff has submitted the checks it received for the change orders prior to the closing and its vice president in his affidavit states that "further evidence that the intention of the parties to handle change order payments in advance and separate from the closing is indicated by the letter dated May 5, 2000 by Pulte that $50 paid in advance for certain aspects of change order No. 4 would be reimbursed at the closing by way of a $50 credit. . . ."
The affidavit goes on to say that the buyers were given written notice of the error but have "refused to make restitution of the $6,560 which the contract required them to pay." It is interesting to note that the CT Page 8296 settlement statement of July 6, 2000, the date of the closing, indicates the "deposit retained by the seller" was "$28,560." The buyers signed this statement and above their signatures appears the following declaration:
 "I have carefully reviewed the HUD-1 Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 settlement agreement."
The defendants point out that the complaint admits it received $448,326 at the July 6th closing and the deed recites the consideration to be the same amount as the plaintiff admits receiving. The warranty deed, recorded on the Groton land records, purports to have been executed by Mr. Barrows, the plaintiffs vice president.
As noted, the basic claim of the defendants is that the doctrine of merger by deed bars the plaintiff from advancing any contract and quasi-contract claim.
The defendants also argue that insofar as the plaintiff is proceeding in the first count on a theory of quantum meruit, recovery should be barred because this case involved new home construction and is thus subject to the provisions of § 20-417d of the General Statutes. Subsection (b) of that statute provides that every contract between a new home construction contractor and a consumer contain a provision advising the consumer that the contractor's prospective customers may contact the consumer as to "the quality and timeliness of such contractor's new home construction work" unless at the time of the contract execution the consumer says he or she does not wish to be contacted.
The agreement between the parties did not contain the required language and thus violates § 20-417g of the General Statutes and is thereby deemed a violation of our unfair trade practices act. The defendants cite cases where recovery under quasi-contract theories was denied "in similar contexts" since permitting recovery would "subvert public policy."
An analysis of the arguments made by the defendants requires an examination of the theories of liability being advanced by the plaintiff in its two counts.
The defendants characterize the first count as advancing an equitable theory of quantum meruit referring apparently to the fact that the fifth paragraph states that the plaintiff received $448,326 of the "agreed total CT Page 8297 price" of $454,886, "the total price which included" $6,560 "worth of change orders incorporated at the request of the defendants and there was a shortfall and balance due" of $6,560. But in the affidavits submitted, as indicated, work on the change orders was off contract and had been paid for prior to the July 6th closing. The real basis of the claim is therefore set forth in paragraph 4 of the first count which alleges that "Due to a mathematical error on the HUD form used at the closing, the defendants were erroneously credited with depositing the sum of ($28,560) when in fact they actually deposited only ($22,000)." This resulted in the plaintiff receiving $6,560 less than it should have at the time of the closing because by clerical error the defendants were credited with paying more money on deposit than they really did. It is like an old common law claim in assumpsit wherein damages are claimed for the nonperformance of an express contract. But such a theory is really the basis also of the straightforward claim in the second count that on or before January, 2000 the defendants owed the plaintiff $6,560 "to balance book account."
 (1.)
The court will now give more detail to and try to paraphrase the defendants' argument in light of the claims of the plaintiff. Two cases are quoted from wherein the merger by deed doctrine is set forth.
 "Under the principle of merger by deed, the terms of the deed would automatically replace and supercede the terms of the underlying contract, absent a reservation of collateral rights," Mongillo v. Commissioner, 214 Conn. 225, 23 (1990).
 "The general rule is that acceptance of a deed in pursuance of articles of agreement for the conveyance of land is prima facie the completion of the contract; and all stipulations contained therein . . . are merged in the deed although omitted therefrom," Knight v. Breckheimer, 3 Conn. App. 490 (1985).
The purchase and sale agreement itself (the contract) in § 5.8 reflects the doctrine of merger by deed. It says:
"Acceptance by Purchaser. The acceptance of a deed by purchaser shall be deemed to be full performance and discharge of every agreement and obligations (sic) herein contained or expressed, except such as are, by the terms hereof, to be performed after the delivery of said deed, and except such items in the plans and CT Page 8298 specifications that are not completed as set forth in an inspection report agreed to by the parties at the closing, together with a time schedule for completion."
The defendants go on to argue that the purchase and sale agreement "is devoid of any language which provides that the duty to pay the purchase price survives the closing" and the schedule itself attached to this document "is devoid of survival language." The argument is basically summed up in the following manner: "Because the agreement to pay the purchase price did not survive the closing, and because the plaintiff has admitted receiving consideration in the deed, the plaintiff is foreclosed from proceeding on its contract and quasi-contract theories of recovery."[1]
This is a necessary argument to make because the purchase and sale agreement says in § 2 that the purchaser agrees to pay the purchase price "upon the terms and conditions hereinafter set forth." The schedule attached to this purchase contract indicates on page 1 that the purchase price was $448,326 and the "deposit paid with this contract" was $22,000. An additional deposit of $20,000 was referred to but apparently never paid so that the balance due at the closing was $426,326 under the terms of the purchase and sale agreement. As indicated through an error in the HUD-1 settlement statement inflated the amount of the deposit actually made toward the purchase price by $6,560.
Under the circumstances of this case, the question presented is whether the merger doctrine should be rigidly applied. A comment in 77 Am.Jur.2d "Vendor and Purchaser" at § 289, page 320, must be kept in mind so that the doctrine can be read in the context of general contract law.
 "The rule that prior expressions are merged into the deed is not as broad and absolute as some abbreviated statements of the doctrine might indicate. The doctrine of merger by deed is an application of the principle of integration in written contracts generally."
It is no doubt true that a deed relative to prior purchase agreements is an integrated agreement but "a recital of a fact in an integrated agreement may be shown to be untrue" § 218(1) of Restatement 2d Contracts. This is so because as said in comment (a), "An integrated agreement may have the effect of discharging a prior promise, conveyance or discharge; it does not establish fictitious events."
Or perhaps more to the point in speaking of integrated agreements, CT Page 8299 generally, § 214 of the Restatement says:
"§ 214. Evidence of Prior or Contemporaneous Agreements and Negotiations.
 Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . .
 (d) illegality, fraud, duress, mistake, lack of consideration, or other invalidating cause."
As said in comment c:
 "What appears to be a complete and binding integrated agreement may be a forgery, a joke, a sham, or an agreement without consideration, or it may be voidable for fraud, duress, mistake or the like, or it may be illegal. Such invalidating causes need not and commonly do not appear on the face of the writing. They are not affected even by a merger clause."
Comment, in part, relied on by court in Tallmade Bros. v. Iroquois GasTransmission System, 252 Conn. 479, 505 (2000).
The problem now before the court can be analyzed also from the perspective of the appropriate application of the parol evidence rule. The comment in one case is instructive at least by way of analogy.
"The parol evidence rule does not of itself, therefore, forbid the presentation of parol evidence, that is, evidence outside the four corners of the contract concerning matters governed by an integrated contract, but forbids only the use of such evidence to vary or contradict the terms of such a contract. Parol evidence offered solely to vary or contradict the written terms of an integrated contract is, therefore, legally irrelevant. When offered for that purpose, it is inadmissible not because it is parol evidence, but because it is irrelevant. By implication, such evidence may still be admissible if relevant (1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in a writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud. JayCT Page 8300 Realty, Inc. v. Ahearn Development Corporation, 189 Conn. 52, 56, 453 A.2d 771 (1963). These recognized exceptions are, of course, only examples of situations where the evidence (1) does not vary or contradict the contract's terms, or (2) may be considered because the contract has been shown not to be integrated; or (3) the equitable ground that relief can be had against any deed or contract in writing founded in mistake or page 359 fraud. . . ." Heyman Associates No. 1. v. Ins. Co. of Pennsylvania, 231 Conn. 756, 780-781 (1995).
Also see HLO Land Ownership A. Ltd v. Hartford, 248 Conn. 350, 359 (1999Tie Communications, Inc. v. Kopp, 218 Conn. 281, 288-289 (1991).
There is another factor involved in this matter which would make the application of the merger doctrine to defeat the plaintiffs claim inappropriate, at least based on the facts and documents submitted in this case. The HUD-1 statement signed by the defendants on the date of the closing was inaccurate to the extent that it represented the deposit money as $28,560 instead of the $22,000 actually submitted by way of deposit. Insofar as this document was relied on at the closing by both sides to this dispute, there was mutual mistake; if the defendants signed it knowing of the scribner's error but hoping to take advantage of it would be inequitable to apply the merger doctrine.
The court does not believe it is necessary to immerse itself in all the technicalities raised by the question of whether the signing of the HUD statement by the defendants meets all the requirements of fraudulent misrepresentation. The language of 214 of the Restatement is much more flexible — see also comment c which talks of "fraud, duress, mistake, or the like," as a grounds to go behind an "integrated contract and turn to prior agreements. The point is that at or about the time the deed was conveyed the parties signed a statement containing an error as to the actual amount deposited for new home construction. This could be evidence that at the time both parties were operating under a mistaken belief central to their contractual relationship, or, that the defendant buyers when they signed could have realized the mistake but not said anything. That is the whole universe of possibilities and either possibility falls within the spirit of an analysis under the Restatement or ordinary parol evidence law which should not permit the merger doctrine to apply. The court is not prepared to ascribe a donative intent to contractors in such situations.
 (2) CT Page 8301
The defendants make another argument against the plaintiffs claim based on public policy. They note that Public Act 99-246 became effective October 1, 1999 and the contract for purchase of the home in this case was executed ninety-five days later on January 4, 2000. That public act contains a provision to the following effect:
 "(b) A new home construction contractor shall include in every contract with a consumer a provision advising the consumer that the consumer may be contacted by such contractor's prospective consumers concerning the quality and timeliness of such contractor's new home construction work, unless the consumer advises such contractor in writing, at the time the contract is executed, that the consumer prefers not to be contacted."
The public act was an amendment to the New Home Construction Act, §§ 20-417a et seq. of the General Statutes.
The January 4, 2000 contract did not include this mandated provision. The defendants therefore argue that even if they cannot rely on the merger doctrine to defeat the plaintiffs claim, public policy prevents the plaintiff from bringing this action. In one of their briefs, the defendants argue that: "In similar contexts, Connecticut courts have held that recovery under theories of quasi-contract was prohibited where recovery would subvert public policy." The cases of Barrett Builders v.Miller, 215 Conn. 316, 320-329 (1990) (Home Improvement Act § 20-429
CGSA interpreted); Biller Associates v. Rte. 156 Realty Co.,52 Conn. App. 18, 31-32 (1999) (interpreting § 38-69 CGSA governing scope of licensed public adjuster's employment); and Solomon v. Gilmore,248 Conn. 769 (1999) (interpreting ambit of Secondary Mortgage Act §§36a-510 et seq. of General Statutes) are all cited by the defendants.
The public policy argument of the defendants is further buttressed by reference to the fact that failure to include the above-referenced contract provision, pursuant to § 20-417g of the New Home Construction Act, "shall be deemed an unfair or deceptive trade practice under subsection (a) of § 42-110b" — i.e., a violation of the Connecticut Unfair Trade Practices Act is involved.
The defendants relying on all this make a persuasive argument in their second brief to the effect that:
"In the present case, recovery under either contract or quasi-contract theories would circumvent the legislative determination that an unfair or deceptive CT Page 8302 practice has occurred and `nullify the statute.' The Connecticut Supreme Court has long recognized `the broad general doctrine founded on the maxim ex turpi causa non oritur actio — no cause of action can arise out of an illegal or immoral inducement.' Gagne v. Vaccaro, 255 Conn. 390, 407 (2001). `[A] court should not allow itself to be made the instrument of enforcing obligations arising out of an agreement that is against public policy, either in law or in equity.' Id., 407-408."
Even given these observations should the court apply a "ja" — "nien" analysis? — in other words, is it really the law that if a party to a commercial or real estate transaction violates some statutory regulation in all cases that party loses its rights in law and equity? It is sometimes inappropriate to apply iron laws to contractual relations even in areas governed by remedial legislation.
Calamari and Perillo in their Law of Contracts, 4th ed. make the following observation:
 "Even assuming an agreement involves some actual or contemplated conduct that violates statutory law or other public policy, the courts do not automatically brand the agreement as illegal. There are countless statutes prohibiting criminal activity. There is a vast array of administrative regulations, the violation of which are penalized. If the legislature states the effect of a violation of a criminal statute upon a contract, that expression of intention must of course be followed. Legislatures, however, do not usually provide for the civil consequences of the violation of the criminal law. In such cases, the matter is one for judicial determination. An English judge has made sound observations in this regard. Judge Devlin in St. John Shipping Corp. v. Joseph Rank LTD, stated: `Caution in this respect is, I think, especially necessary in these times when so much of commercial life is governed by regulations of one sort or another, which may easily be broken without wicked intent. . . . Commercial men who have unwittingly offended against one of a multiplicity of regulations may nevertheless feel that they have not thereby forfeited all right to justice.'"
Connecticut law does not differ from the Calamari analysis. In SolomonCT Page 8303v. Gilmore, supra, it is quite true that the court held the secondary mortgage act, § 36a-510 et. seq, requires a lender or broker to obtain a license and that a secondary mortgage issued by an unlicensed lender is not enforceable. However, the court only reached this conclusion after examining the public policy behind the act and quoted as good law earlier cases to the following effect:
 "Moreover, the court in Sagal also explained that `[i]n cases of this character . . . there is no inflexible rule of arbitrary application for the determination of the effect by implication of the prohibitory statute. The question is one of legislative intent to be gathered from the language of the statute read in the light of the circumstances with which it deals, the remedial object apparently in view, and such conflicting claims of construction.' (Emphasis added.) Id., 296-97. As we have discussed, the enforcement of a contract entered into in violation of § 36a-511 would thwart `the remedial object' of the statute as we have gleaned from the text and legislative history of the secondary mortgage act.
 Finally, it is true, as the plaintiffs point out in their brief, that this court has often stated that `[t]he principle that agreements contrary to public policy are unenforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests. . . ." (Internal quotation marks omitted.) Williams v. Vista Vestra, Inc., 178 Conn. 323, 328 (1979), quoting Twin City Pipe Line Co. v. Harding Glass Co., 283 U.S. 353, 356-57 (1931). We disagree, however, that this principle requires the enforcement of the mortgage at issue in the present case. Rather, we view the public policy concerns that are implicated by violations of § 36a-511 as sufficient to warrant the determination that mortgages taken by lenders in violation of this provision are unenforceable." Id., 248 Conn. at pp. 790-791.
With these observations in mind, it is necessary to examine the purposes behind the statutes in the public policy cases cited by the defendants, Barrett, Biller Associates and Solomon, do the purposes of the public act now before the court, for public policy reasons, require the result reached in those cases be arrived at here in the sense that a CT Page 8304 court must conclude the plaintiff has no right to enforce any remedy?
In Solomon v. Gilmore, supra, the court noted the licensing provisions of the act were not revenue raising enactments but part of a regulatory scheme and noted that "the legislature increasingly has viewed the, secondary mortgage act's licensing requirement as integral to the overall objective of protecting consumers against unscrupulous secondary mortgage lenders," 248 Conn. at pp. 781-782.
In other words, such lenders, if unregulated, would entice people into inequitable and oppressive mortgage transactions at a time when they were financially vulnerable. Also see Biller Associates v. Rte. 156 RealtyCo., 52 Conn. App. 18 (1999) (quantum meruit recovery denied because of failure to comply with licensing requirements for public adjustors in determining fire losses, see § 38-69 CGSA).
In Barrett Builders v. Miller, supra, the court was interpreting the ambit of the Home Improvement Act and held the contractor could not recover for the value of goods and services rendered because there was a failure to comply with the written contract provision of the act. The court determined the policy behind the act and its remedial purpose dictated this result, and at 215 Conn. pp. 326-327 said the following:
 "The skeletonic written agreement, executed on the plaintiffs form, provides nothing to indicate whether the parties contemplated that the defendant was to receive solid core kitchen cabinets, as she alleged, or hollow core cabinets, as the plaintiff apparently supplied. Reading this incomplete agreement, the defendant would not have had warning about the juridical risk of contradictory evidence to which she was being exposed. Without further specifications, she would not have been able to consider, in the interim before the work was begun, whether she had entered into a reasonable, competitively priced bargain. Given the history of continued consumer complaints about home improvement contracts, we are persuaded that strict compliance with the mandate of the statute is inconsistent with permitting recovery in quasi contract. . . .
. . .
This case illuminates an additional problem that recovery in quasi contract in disregard of 20-42
poses. It is evident that the objective of the Home CT Page 8305 Improvement Act is not only to protect homeowners from substandard work, but also to ensure the homeowners are able to make an informed choice on a decision that has potentially significant financial consequences. As one legislator commented, the statute seeks to promote the `right of the consumers to some understanding, some protection.'"
Also see Alan Silver, P.C. v. Jacobs, 43 Conn. App. 184 (1996). Later case of Gagne v. Vaccaro, 255 Conn. 390 (2001), did not overrule that portion of Jacobs that held that failure to secure written contingency agreement pursuant to § 52-251c precluded contract claim against client because as Jacobs noted, the act was meant to regulate the attorney-client relationship so clients would be protected from excessive legal fees, 43 Conn. App. at p. 190.
That is not what we have here. The public act now before the court was not concerned with ensuring the equity of contract formation and fair dealing by providing that only licensed individuals enter into certain financial relations with members of the public nor was it concerned with ensuring that consumers be alerted to the exact scope of work to be done under a contract about to be entered into that might entail large expenditures. The public act was aimed at protecting the consumer from what might be the annoyance of people coming by their homes to see what kind of a job the contractor did who now wants to get a new customer. Ironically, such a contractor would presumably only send prospective customers to view homes he or she thought were well built and owned by satisfied former customers.
The legislature had a right to protect consumers against the nuisance such unagreed to viewing would present, it had a right to subject contractors who engage in this practice to unfair trade practice litigation. But, at least for this court, it goes too far to say that under the circumstances of this case, the great goal of accomplishing public policy would be nullified by correcting what was an error in the amount owing to a contractor after, for all the court knows, a perfectly satisfactory house was built and delivered to the plaintiffs. The defendants or people in their position can pursue any remedies they might have for a violation of the public act under the unfair trade practices act. That should not relieve them of the requirement of litigating a claimed obligation to pay an agreed upon contract price for their home.
The motion for summary judgment is denied.
Corradino, J. CT Page 8306