PHILIP J. LESTER ET AL. *v.* RESORT CAMPLANDS
INTERNATIONAL, INC., ET AL.
(10053)

NORCOTT, FOTI and LAVERY, Js.

Argued December 12, 1991—decision released March 17, 1992

*William F. Gallagher,* with whom were *Bradley P. Larson* and, on the brief, *Cynthia C. Bott,* for the appellants (defendants).

*Kathleen Eldergill,* for the appellees (plaintiffs).

LAVERY, J. The defendants appeal from the judgment rendered, after a jury trial, in favor of the plaintiffs in a case involving membership in a campground. The plaintiffs filed an action against the defendants alleging breach of contract and violations of the Connecticut Unfair Trade Practices Act (CUTPA); General Statutes § 42-110a et seq. On appeal, the defendants claim that the trial court improperly (1) failed to charge the jury on the parol evidence rule as they requested, (2) instructed the jury on issues of contract law and interpretation, and (3) refused to set aside the verdict on both the breach of contract and CUTPA claims. We affirm the judgment of the trial court.

From the evidence produced at trial, the jury could have reasonably found the following facts. On February 20, 1983, the plaintiffs, Philip and Kathleen Lester, entered into an agreement[1] with the defendant State-

___
[1] At trial, the parties agreed that their written contract consisted of (1) a sales and membership agreement, (2) a member handbook containing

line Camping Club, Inc., of East Killingly (Stateline).[2] The sales and membership agreement entitled the plaintiffs to use Stateline's facilities on a first come, first served basis, as set forth in the club rules. The sales and membership agreement further provided that Stateline "will sell no more than six memberships for each Club campsite at any time . . . and that [this agreement] is subject to the terms of said Retail Installment Note (if any) and Rules of the Club, which may be amended or modified at any time. No oral representations have been made to the Buyer as to what amendment or modifications will or will not be made in the future." In addition, the membership and sales agreement stated that the plaintiffs acknowledged that "[i]f the facilities are renovated and until renovations are completed, the utility of my membership may be impaired."

Central to this appeal is the fourteen day rule contained in the member handbook, which provided that "[n]o member may camp in excess of fourteen (14) consecutive days on the same resort-site or area." The rules defined "resort-site" as "[a] physical site consisting of parking space for one recreational vehicle, a service outlet for electricity and water, if so present, and sufficient ground space to provide for one tent." The club rules further provided that "[t]hese rules are subject to change at any time by the Board of Directors of Resort Camplands International, Inc."

Prior to the execution of the agreement, the defendants' sales representative, Michael Taylor, discussed these and other contractual provisions with the plaintiffs. Taylor explained that the plaintiffs would have

---

the rules of the club, (3) various licenses issued to the plaintiffs, and (4) a truth in lending disclosure form.

[2] The defendants named in the complaint are Resort Camplands International, Inc., and Stateline Camping Club, Inc.

unlimited use of Stateline's 200 campsites, on a first come, first served basis. He assured the plaintiffs that there would "always be a place for [them] at Stateline," because memberships were being sold on a six to one ratio.[3] When questioned by the plaintiffs about the four-teen day rule, Taylor explained that it required them to move their camping trailer from resort site to resort site within the campground once every two weeks. Taylor also told the plaintiffs that because Stateline would tow recreational vehicles to an on site storage area, they would never have to remove their trailer from Stateline. Taylor further told the plaintiffs that the pro-vision for rule changes dealt with changing something in the campground, such as the location of a play-ground, that they were "buying in on the ground floor" by buying their membership at that time, and that their maintenance fees could not increase at a rate greater than the increase in the cost of living.

In addition to explaining the contract documents to the plaintiffs, Taylor showed them promotional brochures that claimed that various facilities and ameni-ties existed at Stateline. In fact, many of these ameni-ties did not exist at Stateline.[4]

---

[3] Taylor explained that there was ample room at Stateline because not every buyer purchased the same type of plan. In addition to the member-ship that allowed access only to the Stateline campsite, the defendants offered other "package deals," including: "Camparound," which entitled the buyer to use other campgrounds in New England for a limited time at no cost; "Coast to Coast," which entitled the buyer to use specified camp-grounds located throughout the United States; and "Resort Travel Club," which entitled the buyer to rent camping equipment at a discount. The plain-tiffs ultimately purchased a "V.I.P. Charter" membership package, which included "Camp Coast to Coast," "Camparound," and "Resort Travel Club."

[4] Some of the facilities and amenities depicted in the brochures but not available at Stateline were miniature golf, sailboats, a gym, and a sauna. In addition, many campsites were without water and electricity for long periods of time. Also, Stateline was not a "four seasons" campground as the brochures promised, because it was closed and inaccessible in the win-ter months, offering no winter sports.

After the plaintiffs had purchased their membership, Resort Camplands sold "universal" memberships on a ten to one ratio. At trial, various documents of other members who had purchased after the plaintiffs were admitted into evidence. In April, 1984, the board of directors, through their general counsel and vice president, Kenneth Lenz, informed the members advisory board[5] that it intended to modify the fourteen day rule. The members strongly opposed this "rule change," and no further action was taken by the board of directors. Through 1987, the advisory board questioned Lenz on the status of the possible rule change. Lenz responded that no decision had been made, and that it was unclear whether the rule change would apply to present members. In the summer of 1987, the defendants again proposed the rule change. At the conclusion of a meeting held in July, 1987, Lenz indicated that the rule would not be put into effect.

At trial, the defendants' president, Anthony Newman, testified that since its opening, Stateline had consistently followed a "fourteen days on, seven days off" policy. Lenz testified that the rule was changed in 1984. The plaintiffs, however, introduced a letter from Lenz dated June, 1987, which referred to the "effective starting date of implementation of the Rule" as July, 1987. In a May, 1984 membership newsletter, the defendants presented the rule modification concerning the "fourteen day" rule to the full membership as follows: "[P]lease refer to Rule III, 'Reservation and Use Procedures,' which requires all members to make prior reservations before using the Resort and allows only seven days to be reserved at a time. Once the member has arrived at the Resort he may make a stand-by reservation for an additional seven days. In order to make this rule work, Resort Camplands' Board of Directors

---

[5] The plaintiffs served on the members advisory board, an intermediary between the management of Stateline and the entire membership.

has added an *additional rule which requires that seven days must elapse before the members staying fourteen days can stay again."* (Emphasis added.) This rule required campers to leave Stateline after they had camped for fourteen consecutive days, and did not permit them to return until seven days later, regardless of whether there was space available.

In 1988, the plaintiffs spent fourteen consecutive days in Stateline. The defendants ordered them to leave and not return until seven days had elapsed, and did not give them the option of storing their trailer on site or nearby. The defendants did, however, offer the plaintiffs the opportunity to purchase a new gold card membership. This gold card membership would allow the plaintiffs to remain at Stateline for more than fourteen days at a time if they paid an additional charge per season. Also, the gold card membership would double their maintenance fee and remove the existing cap on maintenance fees which limited their increase to the equivalent of the increase in the cost of living. At the time the plaintiffs left Stateline, the campground had approximately 100 campsites available for use. At trial, Newman testified that from 1987 to 1989 the defendants were looking for alternative ways to generate revenue, and the gold card membership was designed to convince members voluntarily to increase their maintenance fees. Newman further testified that in retrospect it was probably a mistake to have limited maintenance fee increases to the equivalent increases in the cost of living, because the actual increases in operating expenses at Stateline were greater than the increases in the cost of living.

I

The defendants first claim that the trial court improperly failed to charge the jury on the parol evidence rule

as they had requested.[6] The parol evidence rule "prohibits the use of extrinsic evidence to vary or contradict the terms of an integrated written contract." *TIE Communications, Inc.* v. *Kopp*, 218 Conn. 281, 287–88, 589 A.2d 329 (1991). The parol evidence rule does not apply, however, if the written contract is not completely integrated. *Associated Catalog Merchandisers, Inc.* v. *Chagnon*, 210 Conn. 734, 740, 557 A.2d 525 (1989). The question of whether a written contract is integrated is a preliminary question of fact to be determined by the trial court. Id. "Whether a writing is a complete integration of an agreement, ' "the final repository of the oral agreements and dealings between the parties depends on their intention, evidence as to which is sought in the conduct and language of the parties and the surrounding circumstances. . . ." ' *Damora* v. *Christ-Janer*, [184 Conn. 109, 113–14, 441 A.2d 61 (1981)]; *Connecticut Savings Bank* v. *Central Builders' Supply Co.*, 4 Conn. App. 332, 333–34, 494 A.2d 601, cert. denied, 197 Conn. 805, 499 A.2d 56 (1985)." *Suburban Sanitation Service, Inc.* v. *Millstein*, 19 Conn. App. 283, 286, 562 A.2d 551 (1989). "The trial court's determination of intent is not reviewable unless the conclusion drawn is one that cannot be reasonably made." *Catania* v. *Catania*, 26 Conn. App. 359, 364–65, 597 A.2d 1285 (1992).

Our review of this claim, therefore, is limited to a determination of whether the trial court's conclusion that the parties' contract was not integrated was clearly erroneous "in light of the evidence and pleadings contained in the whole record. Practice Book § 4061; *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–23, 435 A.2d 24 (1980); *Metropolitan District* v.

---

[6] Because the defendants filed a written request to charge on the parol evidence rule, this issue has been properly preserved for appellate review. Practice Book § 315; see *State* v. *Kwaak*, 21 Conn. App. 138, 160 n.9, 572 A.2d 1015, cert. denied, 215 Conn. 811, 576 A.2d 540 (1990).

*Housing Authority,* 12 Conn. App. 499, 510, 531 A.2d 194, cert. denied, 205 Conn. 814, 533 A.2d 568 (1987)." *Wilson* v. *Kapetan, Inc.,* 25 Conn. App. 529, 532, 595 A.2d 369 (1991). "As a reviewing court, we cannot sift and weigh evidence; for to do so would usurp the role of the trial court. *State* v. *Cofield,* 220 Conn. 38, 49, 595 A.2d 1349 (1991); *Essex Savings Bank* v. *Leeker,* 2 Conn. App. 98, 102, 476 A.2d 1071 (1984)." *Catania* v. *Catania,* supra, 365.

In the present case, the trial court determined that the parties did not intend to integrate their negotiations in the written contract. The court examined the written documents, the conduct of the parties and the circumstances surrounding their negotiations and contract formation. Our review of the entire record leads to the conclusion that the court's finding of the lack of integration is supported by the record and is not clearly erroneous. Consequently, the jury charge was proper with regard to parol evidence.

II

The defendants next claim that the trial court improperly charged on contract law and interpretation, in that the court (1) failed to determine integration of the parties' agreement, (2) failed to determine what documents made up the contract, and (3) improperly allowed the jury to consider documents pertaining to memberships of individuals who were not parties to this suit. At trial, however, the defendants neither took exception to the charge as given nor submitted a written request to charge. The defendants raise these claims for the first time on appeal, seeking review under the plain error doctrine of Practice Book § 4185.[7]

---

[7] Practice Book § 4185 provides in pertinent part: "The supreme court shall not be bound to consider a claim unless it was distinctly raised at trial or arose subsequent to the trial. The supreme court may in the interest of justice notice plain error not brought to the attention of the trial court."

"Our practice is to review claims that have been distinctly raised at the trial. . . . Plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. *State* v. *Hinckley,* 198 Conn. 77, 87–88, 502 A.2d 388 (1985)." (Internal quotation marks omitted; citations omitted.) *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.,* 216 Conn. 200, 211, 579 A.2d 69 (1990).

We reject the defendants' contention that this claim is reviewable as plain error under Practice Book § 4185. When reviewing a jury charge, we must determine whether the charge as a whole fairly presented the case so that no injustice was done. *State* v. *Hernandez,* 218 Conn. 458, 465, 590 A.2d 112 (1991); *State* v. *Mezrioui,* 26 Conn. App. 395, 406–407, 602 A.2d 29 (1992). With respect to their first two complaints against the jury charge, however, the defendants focus on only one sentence of the trial court's charge.[8]

The trial court did, in fact, determine what documents made up the parties' agreement.[9] In the challenged portion of the charge, the trial court explained to the jury that if it found fraud on the part of the defendants, extrinsic evidence would be admissible.[10]

---

[8] The defendants take issue with that portion of the charge that stated: "On that score we have a total of forty documents here, don't we; so you have to decide now whether those other documents outside the basic contract are part of this agreement between the parties or whether the parties are bound solely by the original signed documents."

[9] See footnote 1, supra.

[10] Parol evidence is always admissible, if relevant, " '(1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in writing which indicates on its face that it does not set forth the complete agreement; or (4) *to show mistake or fraud.' Jay Realty, Inc.* v. *Ahearn Development Corporation,* 189 Conn. 52, 55–56, 453 A.2d 771 (1983)." (Emphasis added.) *TIE Communications, Inc.* v. *Kopp,* 218 Conn. 281, 288–89, 589 A.2d 329 (1991).

This was a proper instruction, because evidence of fraud "tends to show that the contract should be defeated or altered on the equitable ground that 'relief can be had against any deed or contract in writing founded in mistake or fraud.' *Noble* v. *Comstock,* 3 Conn. 295, 299 (1820) . . . ." (Citation omitted.) *TIE Communications, Inc.* v. *Kopp,* supra, 289.

The defendants' claim that the instructions improperly allowed the jury to consider documents pertaining to memberships of individuals who were not parties to this suit likewise is without merit. The documents mentioned in the charge are membership documents of other individuals. These documents were properly before the jury on two grounds. First, if the jury found that the written contract was ambiguous, these documents were admissible as parol evidence to determine the contractual intent of the parties at the time they entered into the contract. *Anderson* v. *Pension & Retirement Board,* 167 Conn. 352, 354–55, 355 A.2d 283 (1974); see footnote 10, supra. Second, they were admissible to rebut the testimony of Newman regarding the fourteen day rule and the ratio of campsites to memberships sold.

After a careful review of the record, we conclude that the jury charge, read as a whole, properly stated the prevailing rules of law and their application to this case, and that no injustice was done. The instruction, therefore, did not constitute plain error.

### III

Finally, the defendants claim that because the evidence was insufficient, the trial court improperly refused to set aside the verdict on both the breach of contract and CUTPA claims.

"In determining whether a verdict should be set aside, the court is obligated first to review the evidence

giving it a construction most favorable to sustaining the jury's verdict. *Kalleher* v. *Orr,* 183 Conn. 125, 126–27, 438 A.2d 843 (1981). In addition, the trial court's refusal to disturb the jury verdict is entitled to great weight, and every reasonable presumption should be given in favor of its correctness. *Waldron* v. *Raccio,* 166 Conn. 608, 618, 353 A.2d 770 (1974); *Shenefield* v. *Greenwich Hospital Assn.,* 10 Conn. App. 239, 247, 522 A.2d 829 (1987). In reviewing this issue, our sole responsibility is to decide whether, on the evidence presented, the jury could fairly reach the conclusion they did. *Wu* v. *Fairfield,* 204 Conn. 435, 440, 528 A.2d 364 (1987)." *Pagani* v. *BT II Limited Partnership,* 24 Conn. App. 739, 747–48, 592 A.2d 397 (1991).

At the outset, we detailed the facts that the jury could reasonably have found, taken in the light most favorable to sustaining the verdict. In support of their claim that the evidence was insufficient to support the jury's verdict on the breach of contract claim, the defendants focus on the evidence they presented at trial. The defendants' evidence often conflicted with that of the plaintiffs. "Although conflicting evidence was presented at trial, we cannot conclude on that basis that the jury verdict should not stand. The choice of the more credible evidence was for [the jury] to make. *Desmarais* v. *Pinto,* 147 Conn. 109, 110, 157 A.2d 596 [1960]. *Petrizzo* v. *Commercial Contractors Corporation,* [152 Conn. 491, 499, 208 A.2d 748 (1965)]. It is the province of the jury to weigh the evidence and determine the credibility and the effect of testimony; and we must decide the question whether on the evidence presented, the jury could have fairly reached their verdict for the [plaintiff]. *Hanauer* v. *Coscia,* 157 Conn. 49, 53, 244 A.2d 611 [1968]. . . . *Novella* v. *Hartford Accident & Indemnity Co.,* [163 Conn. 552, 561, 316 A.2d 393 (1972)]." (Internal quotation marks

omitted.) *Ford* v. *Blue Cross & Blue Shield of Connecticut, Inc.,* 216 Conn. 40, 58, 578 A.2d 1054 (1990).

In this case, there were ample facts that could lead the jury to the conclusion that the defendants breached their contract with the plaintiffs. The defendants sold memberships at a ratio greater than six to one, failed to provide all of the facilities and amenities originally promised, refused to allow the plaintiffs unlimited use of a campsite at the campground on a first come, first served basis, and implemented the fourteen day rule in 1988, which required the plaintiffs to leave the campground for at least seven days after they had camped for fourteen consecutive days. We conclude that the verdict reached by the jury on the breach of contract claim was reasonable in view of the evidence. The trial court, therefore, properly refused to set aside the verdict.

Similarly, the verdict for the plaintiffs on their CUTPA[11] claim withstands our scrutiny. CUTPA is a remedial statute that is designed to protect consumers from unfair or deceptive trade practices, and must be construed liberally to further its purpose. *Sportsmen's Boating Corporation* v. *Hensley,* 192 Conn. 747, 756, 474 A.2d 780 (1984). "In determining when a practice is unfair, we have ' "adopted the criteria set out in the 'cigarette rule' by the federal trade commission . . . '(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness;

---

[11] General Statutes § 42-110b provides: "UNFAIR TRADE PRACTICES PROHIBITED. LEGISLATIVE INTENT. (a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . . (d) It is the intention of the legislature that this chapter be remedial and be so construed."

(2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)].' . . ." ' " (Citations omitted.) *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.,* supra, 215.[12] Although the same facts that establish a breach of contract claim may be sufficient to establish a CUTPA violation; *Webb Press Services Corporation* v. *New London Motors, Inc.,* 203 Conn. 342, 525 A.2d 57 (1987); the jury in the present case was entitled to consider only those actions of the defendants beginning on July 19, 1985, for purposes of determining a CUTPA violation, because the statute of limitations for CUTPA actions is three years.[13] A CUTPA violation need not involve fraud on the part of the violator, but, in this case, the jury expressly found that the defendants intentionally engaged in unfair or deceptive acts or trade practices in dealing with the plaintiffs.[14] The defendants in the present case unilaterally altered that portion of their contract with the plain-

---

[12] " 'In discussing the third criterion, the federal trade commission has stated: "The independent nature of the consumer injury criterion does not mean that every consumer injury is legally 'unfair,' however. To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided." . . .' *McLaughlin Ford, Inc.* v. *Ford Motor Co.,* [192 Conn. 558, 569–70, 473 A.2d 1185 (1984)]." (Citations omitted.) *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.,* 216 Conn. 200, 216, 579 A.2d 69 (1990).

[13] General Statutes § 42-110g (f) provides: "An action under this section may not be brought more than three years after the occurrence of a violation of this chapter."

[14] The following interrogatories were submitted to the jury. "1. Did the Defendants Resort Camplands International, Inc., and Stateline Camping Club, Inc., through their agents or servants unjustifiably violate the contract between the parties? 2. Did the Defendants, through their servants or agents, after July 19, 1985, engage in unfair or deceptive acts or trade practices in dealing with the Plaintiffs? 3. If the answer to Interrogatory No. 2 is yes, were the acts of the Defendants, after July 19, 1985 intentional or with reckless disregard of the Plaintiffs' rights?" The jury answered each of these interrogatories in the affirmative.

tiffs that allowed unlimited access to the campground, providing there was space available, unless they paid additional sums and agreed to increase their maintenance fees by purchasing a gold card membership. This unilateral breach created additional revenues for the defendants, which sold over 100 gold card memberships through August, 1990.

From all the evidence presented at trial, the jury could have reasonably inferred that the reason for the implementation of the fourteen day rule was to force members such as the plaintiffs to pay additional sums of money to receive what they had already purchased: the right to use Stateline as often as they wanted on a first come, first served basis. The actions of the defendants in the present case is a prime example of the type of conduct which CUTPA seeks to remedy. The jury could reasonably have determined that the defendants' actions violated any one or all of the cigarette rule criteria. " 'Some of the oldest "unfairness" decisions involve sellers' refusals to live up to the terms of their contract. The Commission has often challenged sellers for traditional breaches of contract . . . . Breach of contract has long been condemned as a matter of law, economics, and public policy.' . . . " (Citations omitted.) *Orkin Exterminating Co.* v. *Federal Trade Commission*, 849 F.2d 1354, 1367 (11th Cir. 1988), cert. denied, 488 U.S. 1041, 109 S. Ct. 865, 102 L. Ed. 2d 989 (1989).[15]

---

[15] In *Orkin Exterminating Co.* v. *Federal Trade Commission*, 849 F.2d 1354 (11th Cir. 1988), the defendant entered into a lifetime exterminating contract with consumers. The contract required the consumers to pay an annual premium, which would not increase unless there was a structural modification to the consumers' premises. Id., 1356. Five years later, the defendant increased the annual premium to counter its operating losses. Id., 1358. In response to consumer complaints, the defendant instituted an accommodation program, which included a waiver of the premium increases under certain circumstances. Id. The federal trade commission found that the defendant's unilateral breach of contract violated

The judgment is affirmed.

In this opinion the other judges concurred.

the third cigarette rule criterion. Id., 1359. The Eleventh Circuit Court of Appeals affirmed the commission's decision in its entirety. Id., 1368.