[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a suit by the plaintiff, Kathy McShane, to recover commissions allegedly due to her from the two defendants, The Mirand Group (Mirand), formerly known as Coverdell Marketing Group, Inc. (Coverdell), and Andrea Pizzuti.
The complaint as amended is in eight counts, the first five of which are directed against Mirand. The first count alleges that the plaintiff acted as an agent for Mirand in its direct mail marketing program pursuant to an oral contract; that she was promised 25% of the profits earned by Mirand from each client that she interested in purchasing Mirand's services and programs; and that commissions are still owing to her. The second count claims that the plaintiff arranged a credit card affinity program between Dollar Dry Dock Savings Bank (Dollar Dry Dock) and the Vietnam Veterans of America (VVA), which was to be in existence for a three-year period, but that she had been removed from the project and had not been paid commissions that were due. The third count seeks an accounting, the fourth claims a violation of the Connecticut Unfair Trade Practices Act, General Statutes 42-110b, et seq. (CUTPA), and the fifth refers to fraudulent misrepresentations. CT Page 4482
The remaining counts are directed against Andrea Pizzuti. Count six claims that this defendant received a 50% commission from Mirand in connection with the VVA affinity credit card program, and that Pizzuti had agreed to split this commission with McShane, but failed to do so. The seventh, eighth and ninth counts seek an accounting, claim a violation of CUTPA, and allege fraud, respectively.[1]
Mirand filed an answer containing several special defenses, including that the plaintiff had been fully compensated for her services; that her oral contract with the defendants was based on a claim for compensation over the course of three years and, therefore, violated the statute of frauds, General Statutes 52-550; and also that an accord and satisfaction had occurred.
In her answer to the complaint, defendant Pizzuti agrees that in September, 1986, she became an agent for Coverdell, which later changed its name to The Mirand Group, in its direct mail marketing division; that in the spring of 1987, she and McShane entered into an oral agreement in which the plaintiff would also act as an agent for Mirand in direct
marketing sales activities; that the plaintiff was to be paid 25% of the net profits "earned from her efforts"; that McShane did work on the Vietnam Veterans account; and that plaintiff's compensation, if any was due, was owned by Mirand.
Pizzuti also filed several special defenses, including that any commission due McShane was to be paid only by Mirand because Pizzuti had acted solely as an agent for that company; that the plaintiff had been fully compensated for her efforts; that the statute of frauds had been violated; that there had been an accord and satisfaction; and that the statute of limitations had expired.[2]
The case was tried to the court, and based on testimony of the witnesses and examination of the exhibits, the following is a summary of the pertinent facts. Plaintiff and Pizzuti did enter into an oral contract in or around February, 1987, in which it was agreed that McShane would receive 25% of the net profits from any new business that she developed and worked on for Mirand and Pizzuti. The 25% represented in reality one-half of the 50% that Pizzuti was to receive from Mirand. The parties never formalized their agreement in writing, although several drafts of a contract were circulated. Those drafts were never signed because McShane registered several objections to the terms, including the failure to provide for payment to her for the duration of the Dollar Dry Dock-VVA contract.
The plaintiff's most important assignment from Mirand and Pizzuti was to bring Dollar Dry Dock and the VVA to an agreement regarding the issuance of an affinity credit card, described as a credit card, such as VISA, issued by a bank to a discrete group, such as the VVA. The credit CT Page 4483 card is customized to include the name and logo of the association or group, which receives a percentage of both the cardholder purchase transactions and annual membership fees. Dollar Dry Dock, through one of its officers, John Mullady, had already expended a good deal of effort attempting to forge an agreement with the VVA, but both Mullady and Pizzuti had lacked the time to finalize a contract. The plaintiff began this assignment in April, 1987, and was able to get the proper officials from the VVA to meet with Mullady. Ultimately, in June, 1987, Dollar Dry Dock and the VVA reached an agreement, although McShane played a very limited role in the negotiations that led to the contract. The plaintiff continued to work actively on the account for several months in the summer of 1987, and she was paid by one check in the amount of $27,770.[3]
The plaintiff did not receive any compensation for 1988 or 1989.
The plaintiff agreed that she had been fully compensated by Mirand and/or Pizzuti for other accounts that she had handled, and that her only claim in this lawsuit involves the Dry Dock-VVA account. By August or September, 1987, the business relationship between the plaintiff and Pizzuti had deteriorated, and McShane had ceased working with and for Pizzuti on this particular account. The plaintiff claims that she was squeezed out of the VVA project by Pizzuti, and that since she was the person who brought Dollar Dry Dock and the VVA to the bargaining table, which ultimately resulted in a contract between those two parties, she is entitled to 25% of the net profits for the full three years of the contract, including 1988 and 1989, even if she performed no management duties with respect to that account after August or September, 1987. Pizzuti, on the other hand, claims that McShane voluntarily decided to cease working with her on the VVA account, and hence was not entitled to any compensation thereafter.
We start with the proposition that the plaintiff did not have a written contract regarding the duration or scope of her duties with respect to the VVA project. My sense of the oral agreement between McShane and Pizzuti is that the plaintiff was entitled to 25% of the net profits Mirand earned from direct mail accounts McShane helped bring to the company, but only so long as McShane played an active role in managing a particular account. It is difficult to accept the plaintiff's claim that Pizzuti agreed to pay one-half of her commissions to the plaintiff for three years in the case of the VVA account even if McShane was not actually performing any management duties.
The plaintiff concedes that after the contract between Dollar Dry Dock and the VVA was finalized, she co-managed the account with Pizzuti for several months, but describes these services as in effect gratuitous or voluntary. I disagree and believe McShane worked on the VVA project because that is what she was being paid for. After the plaintiff stopped working on that particular account, she was no longer entitled to any compensation under the agreement, although she did work on other projects for which she was fully compensated. At one point in her testimony, the plaintiff stated that she complained to Pizzuti that 25% of the net CT Page 4484 profits was not enough, and described her efforts as follows: "I'm the one on the line. I'm the one who the clients are screaming at when something doesn't happen. I'm the one taking all the risks. I'm doing all the work. I just don't feel that 25 percent is enough for the amount of work that I'm doing." This self-portrait hardly describes one whose claim is that her only function was to be a "broker", one whose sole task was to bring the parties to the bargaining table, and after a contract was agreed upon, to sit back and rake in the profits. Moreover, Mullady himself testified that Mirand intended to pay Pizzuti and/or McShane only for actual marketing and managing services rendered.
In addition, even if the plaintiff's version of the agreement was credible, and Pizzuti had agreed to pay McShane commissions over the course of the three years the Dollar Dry Dock-VVA contract was in existence, a statute of frauds problem would arise under the authority of C. R. Klewin. Inc. v. Flagship Properties, Inc., 220 Conn. 569, 573,600 A.2d 772 (1991). Klewin holds that an oral contract of indefinite duration is outside the statute of frauds, and may be enforced, but a contract which expressly provides for a limited duration beyond one year is within the proscriptive force of this statute. Id., 583-84. The plaintiff alleged that her oral contract with Pizzuti provided that she would be compensated by Pizzuti and/or Mirand during the three-year duration of the Dollar Dry Dock-VVA contract. At one point in her testimony, the plaintiff herself described her contract with Pizzuti as follows: "We have a three year agreement."
Plaintiff's contract with the defendants therefore could not possibly be performed within one year because, by its own explicit terms according to McShane, it was to be performed over the course of three years. Thus, even if Pizzuti had agreed to a three-year contract with the plaintiff, which I do not believe was the case, the plaintiff still could not enforce her agreement because of the statute of frauds, General Statutes52-550(a)(5). To the same effect is Jacobs v. Thomas, 26 Conn. App. 305,312, 600 A.2d 1378 (1991) (statute of frauds applies to those contracts "whose performance cannot possibly be completed within a year").
The plaintiff claims that she fully performed her obligations under the contract by bringing Dollar Dry Dock and the VVA to the bargaining table, thus taking her case out of the statute of frauds. While full performance by one of the parties to a contract removes it from the statute; Burkle v. Superflow Manufacturing Company, Inc., 137 Conn. 488,498, 78 A.2d 698 (1951); this exception is not applicable in this case. I believe that McShane's performance required her active participation in managing the VVA account over the course of its three year existence, which the plaintiff did not carry out. As pointed out previously, plaintiff did perform managerial work on this account in 1987 for which she was compensated.[4]
The plaintiff's claim for damages for a violation of CUTPA has not been proved. A breach of contract can constitute a violation of CUTPA; Lester v. CT Page 4485 Resorts Camplands International. Inc., 27 Conn. App. 59, 72, A.2d (1992); but only if the conduct complained of (i) offends public policy; (ii) is immoral, unethical, oppressive, or unscrupulous; (in) causes substantial damage to consumers. Krawiec v. Blake Manor Development Corporation,26 Conn. App. 601, 607, 602 A.2d 1062 (1992). Generally, all three criteria need not be satisfied. Atlantic Richfield Co. v. Canaan Oil Co.,202 Conn. 234, 242, 520 A.2d 1008 (1987) ("A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three"). I do not believe the defendants violated any of the criteria of CUTPA in this case, because no public policy is at stake, the defendants' conduct was not immoral, etc., and the plaintiff, even if she could be considered a"consumer", was not "damaged" in the sense that there was no enforceable contract affording her compensation for three years.[5]
Because I believe that the plaintiff has failed to sustain her burden of proof that the defendants breached their oral contract with her, an accounting is not warranted, and judgment may enter in favor of Mirand and Pizzuti, with costs to be taxed by the clerk.
So Ordered.
Dated at Stamford, Connecticut, this 15 day of May, 1992.
WILLIAM B. LEWIS, JUDGE