[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a case of fraud on the part of the defendant and breach of contract by the plaintiff. It was tried to me over three days in February of this year. The parties testified at length, so that I had ample opportunity to assess their credibility. Based on the testimony I heard, my evaluation of the credibility of the parties and the other witnesses and the exhibits that were introduced, I find the following to be the facts.
The parties' dispute arises out of a lease which they entered into on July 18, 1992. The lease, in turn, was the culmination of several months of negotiation, during which period both were represented by counsel. Early on in the negotiations the plaintiff, Michael Lanese (Mr. Lanese[1]), expressed his concern that the property in question be free of environmental hazards. He repeated this concern throughout the negotiations, and the defendant, Mr. Mecca, assured him that such was the case. On one occasion Mr. Mecca told Mr. Lanese that he had a "stamp of approval" from the Department of Environmental Protection; another time he said that the property was "clean" and he "had a report to prove it." No such report was ever provided to Mr. Lanese prior to the lease being executed. When the lease was put in final written form, however, the following language was added CT Page 10015 to Article XX by Mr. Lanese's attorney and at Mr. Lanese's insistence:
 Lessor represents that the property is free of any hazardous waste or pollution and in all respects complies with the Department of Environmental Protection's rules and regulations concerning hazardous waste.
Mr. Mecca initialed this addition in the original of the lease.
Several other terms of the lease bear on the claims of the parties. For example, section 5.2 requires Mr. Mecca to "remove any hazardous waste tanks" on the property and install "new, clean ones," further evidencing Mr. Lanese's concern over hazardous waste problems. Section 5.3 contains strong, clear language forbidding any "change or alteration" in the property without the written agreement of Mr. Mecca. Section 9.2 allows Mr. Mecca to retain "all additions, alterations and improvements" in the event of a default by Mr. Lanese. Article IX spells out what constitutes a "default" in the lease and Mr. Mecca's remedies in that event, and section 14.1 provides that those remedies are cumulative. Finally, Article XXV accords Mr. Lanese an option to purchase the property at any time during the lease, for the sales price of $800,000, and stipulates that he will receive a credit against the price for one-half of the rents paid to the date of delivery of the deed.
For 40 years prior to this transaction Mr. Mecca had operated a gas station and auto sales facility on this property. He stopped selling gas and had his underground gasoline storage tanks removed in 1989. Mr. Lanese was operating an auto sales business next door to the property in 1989 and was aware that the tanks had been removed. He did not know, however, that Mr. Mecca had received a report at that time concerning the chemical content of certain soil samples taken from the property. In fact, he did not receive a copy of that report until March 1993, eight months after the lease was signed and when events had already led him to believe that the property was not "free of any hazardous waste or pollution," as warranted by Mr. Mecca. Prior to entering into the transaction at issue here, Mr. Mecca had never reviewed the results of the report with anyone to determine whether the ground had been contaminated from its many years of use as a gas station. Nevertheless, he made such representations to Mr. Lanese repeatedly during the negotiations and so warranted in the lease. CT Page 10016
Both prior to the signing of the lease (pursuant to a "hold harmless" agreement executed on June 16, 1992, after Mr. Mecca had made oral representations that the property was pollution-free) and thereafter, Mr. Lanese made extensive renovations to the property. None of these were approved by Mr. Mecca in the manner called for in the lease, although Mr. Mecca was present very often while they were being made and registered no protest, at least to some of them. Some of the renovations were of the kind that would be necessary simply to operate the auto auction Mr. Lanese planned for the property, and some were extensive enough to evidence his intent to become the owner of the property by exercising the option to purchase the property contained in the lease.
Indeed, Mr. Lanese's intention to exercise that option is hardly in dispute. He testified that he expressed that intention to Mr. Mecca, and Mr. Mecca testified that he knew Mr. Lanese intended to purchase the property when they were negotiating the deal.
Mr. Lanese opened his auto auction in August 1992. Although he introduced no business records to substantiate his claim, Mr. Lanese testified the business was very profitable. He continued the auctions until March 1993 and sold used cars thereafter until he vacated the premises in October-November 1993 or January 1994, depending on which view of the evidence one takes.
In February 1993 Mr. Lanese decided to remove the island on which the gas pumps had been placed during the property's life as a gas station, to afford easier access to the premises for vehicles. In the course of their removal, when the ground was broken open, a very strong odor of petroleum escaped. Work stopped immediately, and Mr. Lanese contacted an environmental testing company. Upon receipt of its report in March he stopped payment on that month's rent check, and, although he continued to operate his business on the property for several months, he never paid rent again.
While Mr. Lanese made one offer to purchase the property for an amount far less than the $800,000 provided in the lease, no negotiations between the parties were conducted concerning either the purchase or his continued occupancy. After several months of non-payment of rent, Mr. Mecca commenced a summary process action, which resulted in a judgment of eviction on January 5, CT Page 10017 1994 and an execution on January 19, 1994. The execution indicates that Mr. Lanese had already vacated the premises, but just when he did so was never established in the evidence. Whenever he vacated, he left the property a mess, and Mr. Mecca was required to expend money to put it in shape to be offered again for rent. It does not appear from the records evidencing his costs of repair that he made any serious efforts to do so until many months later; in any event, the property was not rented again until July 1994, at a monthly rental of $3,000.
Obviously, whether or not the property was contaminated with hazardous waste at the time of Mr. Mecca's representations to the contrary is a critical issue. Mr. Lanese offered expert testimony, analyzing the March 1989 report Mr. Mecca had been given and the report of the March 1993 testing Mr. Lanese had done. That witness, an environmental engineer, testified that the 1989 report Mr. Mecca had (but did not have interpreted or provide to Mr. Lanese) showed "evidence of petroleum product contamination in the ground" at 600 Meriden Road at that time, which would be considered "pollution." The same witness testified that the test report Mr. Lanese had received in March 1993 showed "very high levels" of three chemicals which he characterized as "hazardous waste." While the witness agreed that "to a certain extent" it was "speculative" to say what was the source of the contamination he saw in these reports and that it was very difficult to date just when the contamination had occurred, he also found that the high levels of Xylene and Benzene made it "far more indicative of gasoline than of fuel oil" and unlikely to have been a recent spill.
This witness' testimony was detailed, credible and unrebutted. It established to my satisfaction that Mr. Mecca's property was not "free of pollution and hazardous waste" either in 1989 or in 1992, and that Mr. Mecca had the ability to determine that before he entered into this transaction and made the representations concerning pollution and hazardous waste to Mr. Lanese.
Based on these facts, the parties make the following claims. In his complaint Mr. Lanese seeks to recover from both Mr. Mecca individually and from Mecca Motors, Inc., the record owner of the property, for Mr. Mecca's misrepresentations regarding the presence of hazardous waste on the property, a breach of the lease agreement, unjust enrichment and a violation of the Connecticut Unfair Trade Practices Act (CUTPA). As damages he CT Page 10018 claims every expenditure he made in connection with the lease of the property and the initiation and conduct of his business.
Mr. Mecca is the sole owner and president of Mecca Motors, Inc. and was so at the time of his alleged misrepresentations. "It is black letter law that an officer of a corporation who commits a tort is personally liable to the victim regardless of whether the corporation itself is liable." Kilduff v. Adams,Inc., 219 Conn. 314, 331-32, 593 A.2d 478 (1991). See alsoAltieri v. Nanavati, 41 Conn. Sup. 317, 319 (1989). See Zaist v.Olson, 154 Conn. 563 (1967). Therefore, if Mecca Motors, Inc. is liable due to the actions of Mr. Mecca as its sole owner and president, as it must be, so is Mr. Mecca. Furthermore, it is clear from the different versions of the lease received in evidence that Mr. Mecca signed it originally in his individual capacity.
Mr. Mecca counterclaims for the unpaid rent, and interest and a 10% surcharge provided for in the lease, damages for Mr. Lanese's allegedly negligent and reckless use of the property and his use of the property in ways not permitted in the lease, unjust enrichment, conversion and a CUTPA violation, based on Mr. Lanese's alleged use of the premises other than as permitted in the lease.
The Plaintiff's Claims
1. Counts I and V[2]: Fraud
Mr. Lanese alleges that, knowing he wanted to purchase the property in question during the term of the lease, Mr. Mecca made oral and written representations that it was free of hazardous waste when he knew or should have known that the property was not as represented. These counts also contain the other allegations needed to state a cause of action for fraud; viz., that the representations were made as statements of fact, that they were made to induce Mr. Lanese to enter into the transaction, and that he did act on those representations to his injury.
The only genuine question raised by the evidence is Mr. Mecca's state of mind. He testified that he had never consulted with anyone concerning the contents or meaning of the report he received in 1989, and that it was "all Greek to [him]". Having reviewed the report (Exh. A), I can well understand Mr. Mecca's testimony. Was he at liberty, however, to enter into this deal CT Page 10019 without finding out what the report meant and disclosing that, when he knew that a property free of hazardous waste was paramount to Mr. Lanese's willingness to do the deal?
"We have held that a misrepresentation made without belief in its truth or recklessly made can also provide the basis for a fraud claim. Clark v. Haggard, 141 Conn. 668, 673, 109 A.2d 358
(1954)." Kilduff v. Adams, Inc., supra, 219 Conn. 329 n. 15. See also Smith v. Frank, 165 Conn. 200, 202, 332 A.2d 76 (1973). Recognizing that the standard of proof of fraud is "clear and satisfactory evidence" rather than a preponderance of the evidence, Kilduff v. Adams, Inc., supra, 219 Conn. 328, I cannot find that Mr. Mecca acted with knowledge of the falsity of his representation, but I do find that he acted with reckless disregard for his statements' truth or falsity, and that is sufficient to make out a case for fraud. Compare Parker v. ShakerReal Estate, Inc., 47 Conn. App. 489, 494, 705 A.2d 210 (1998) ("[w]e find no evidence that any of the defendants either made a false representation to the plaintiffs . . . or had knowledge of the prior use and history of the property. Absent such evidence, the plaintiffs' counts of fraudulent misrepresentation and fraudulent failure to disclose must necessarily fail"). While repeatedly and affirmatively stating that his property was free of hazardous waste, Mr. Mecca did nothing to ascertain whether that was the case when he had in his hands a report that bore directly on that question. Moreover, he warranted in the lease that the property was "free of any hazardous waste or pollution and in all respects complies with the Department of Environmental Protection's rules and regulations concerning hazardous waste." (Emphasis added.) He had no reason to believe in the truth of this representation.
 In matters susceptible of actual knowledge, if the party who has and is known to have the best means of knowledge, makes an affirmation contrary to the truth, in order to secure some benefit to himself, the law treats him as stating that he knows that whereof he affirms, and so as guilty of a fraud, although he spoke in ignorance of the facts; because he asserts that he knows what he does not know. . . . A fraudulent representation in law is one that is knowingly untrue, or made without belief in its truth, or recklessly made and for the purpose of inducing action upon it. Clark v. Haggard, supra, 672-73. (Internal quotations marks and citations omitted.)
CT Page 10020
Mr. Mecca sought to excuse his conduct by testifying that, when the gasoline storage tanks were removed in 1989, he was told by a representative of the Department of Environmental Protection that the property was "clean"; therefore, his representations were merely statements of opinion not fact. Cp. McClintock v.Rivard, 219 Conn. 417, 426-27 (1991). No evidence other than Mr. Mecca's testimony was ever introduced to support that assertion. If offered to prove that the property was, in fact, pollution-free in 1989, it was hearsay. If offered to prove Mr. Mecca's state of mind, it was uncorroborated and blatantly self serving on a critical issue. In either event I find the testimony to be unreliable.[3]
Mr. Mecca also testified that he meant that the property was free of hazardous waste "as far as he knew" when he agreed to the additional language in Article XX, and that he meant it was alright to be used for an auto sales business. This testimony was clearly offered to vary and contradict the unambiguous terms of the lease contract, which I find to be a complete expression of the parties' agreement. As such, it runs afoul of the "parol evidence rule" and may not be considered for that purpose. SeeGiorgio v. Nukem, Inc., 31 Conn. App. 169, 173-74, 624 A.2d 896
(1993).
Mr. Lanese has proven his allegations of the essential elements of a fraudulent misrepresentation, including damages, which will be discussed below. (See p. 28 et seq.)
Counts II and VI: Breach of Contract
A lease, of course, is a contract, and "the rules applying to contracts generally with respect to breach, the right to damages for breach, and the measure of damages, apply to leases as well as contracts." (Internal quotation marks omitted.) Rokalor, Inc.v. Connecticut Eating Enterprises, Inc., 18 Conn. App. 384, 391,558 A.2d 265 (1989). The elements of a breach of contract action are an agreement, performance, a breach and damages.
The breach in this case is clear. Mr. Mecca promised to provide Mr. Lanese with premises which were free of hazardous waste and pollution, and he did not. I find that the damages suffered as a result of Mr. Mecca's breach are the same as those flowing from his fraud, and both will be discussed later in this memorandum. (See p. 28 et seq.) CT Page 10021
3. Count III and VII: CUTPA
"No person shall engage in . . . unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statute § 42-110b(a). "Any person who suffers any ascertainable loss of money or property . . . as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages." General Statutes § 42-110g(a).
"Trade or commerce" in the Act is defined to include a lease transaction such as this one. § 42-110a(4), C.G.S. While a number of Superior Court decisions have held that a CUTPA cause of action does not lie from a simple breach of contract, absent aggravating circumstances,[4] "a violation of CUTPA may be established by showing . . . an actual deceptive practice . . ." (Internal quotation marks omitted.) Cheshire Mortgage Service,Inc. v. Montes, 223 Conn. 80, 106, 612 A.2d 1130 (1992). See alsoLester v. Resort Campgrounds International, Inc.,27 Conn. App. 59, 71-72 (1992). As demonstrated in the discussion of Count One, above, Mr. Mecca engaged in just such a practice in this case. "Furthermore, a party need not prove an intent to deceive to prevail under CUTPA. . . . [K]nowledge of falsity, either constructive or actual, need not be proven to establish a CUTPA violation." Id. Therefore, even though Mr. Mecca might not have "known" of the pollution of the property he was leasing to Mr. Lanese, he would still be liable under CUTPA for his misrepresentation. "[T]he subjective good faith of one who has in fact performed an unfair or deceptive act is not a defense to a CUTPA violation." Daddona v. Liberty Mobile Home Sales, Inc.,209 Conn. 243, 255, 550 A.2d 1061 (1988).
There has also been a debate among Superior Court judges, carried on through opinions in individual cases, over whether a single unfair or deceptive act, as opposed to a pattern of such acts, can give rise to a CUTPA violation. See generally, HaydenMachinery, Inc. v. Stonecrafters, Inc., Superior Court, judicial district of New Haven at Meriden, Docket No. 249141 (October 12, 1995, Silbert, J.). The debate arises out of the different formulations in the statute quoted above, singular versus plural, of what constitutes an actionable wrong. A majority of the judges who have addressed the issue have concluded that it is enough for a plaintiff to show one deceptive act by the defendant, including opinions written in the context of a lease/purchase agreement. See Gustafson v. Young, Superior Court, judicial district of New CT Page 10022 London at Norwich, Docket No. 105199 (July 11, 1994, Teller, J.);Lovick v. Nigro, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 542473 (Feb. 21, 1994, Lager, J.). Perhaps more importantly, in several cases in which the Supreme Court has closely considered the application of CUTPA, there was only a single deceptive or unfair act in question. See, e.g., Tessmann v. Tiger Lee Construction Co., 228 Conn. 42,42-43, 634 A.2d 870 (1993); Web Press Services Corp. v. New LondonMotors, Inc., 205 Conn. 479, 479-80, 533 A.2d 1211 (1987);Hinchliffe v. American Motors Corp., 184 Conn. 607, 619,440 A.2d 810 (1981).
Based on the remedial[5] character of CUTPA and the liberal construction to which it is consequently entitled, as well as the Supreme Court's practice of repeatedly considering cases arising out of individual acts, I conclude that the single deceptive act of Mr. Mecca in this transaction is sufficient to give rise to liability under CUTPA.[6]
Mr. Lanese must also have shown an "ascertainable loss" to maintain an action under CUTPA. This requirement has been described as "a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief." Hinchliffe v. American MotorsCorp., supra, 184 Conn. 615. "An ascertainable loss is a deprivation, detriment [or] injury that is capable of being discovered, observed or established. . . . [A] loss is ascertainable if it is measurable even though the precise amount of the loss is not known. . . . Under CUTPA, there is no need to allege or prove the amount of the ascertainable loss. . . . A plaintiff need not prove a specific amount of actual damages in order to make out a prima facie case . . ." Id., 612-14.
Here Mr. Lanese bargained for and thought he had obtained a pollution-free property which he could lease and eventually buy for the conduct of his auto auction business. He had made that clear to Mr. Mecca throughout the negotiations. The expert testimony at trial made it clear that this is not what he got. Thus, he did not receive the "benefit of the bargain," a traditional measure of damages in a case arising out of fraud,Miller v. Appleby, 183 Conn. 51, 57-58, 438 A.2d 811 (1981), and his loss is clearly ascertainable, as those terms have been defined under CUTPA. Hinchliffe v. American Motors Corp., supra, 614. CT Page 10023
4. Counts IV and VIII: Unjust Enrichment
Mr. Lanese's final claim is that Mr. Mecca has been unjustly enriched by the improvements Mr. Lanese made to the property while he was in possession. That Mr. Mecca was enriched is indisputable; he has re-leased the premises for the conduct of an used auto sales business, and Mr. Lanese's improvements to the property cannot but have made it more attractive for that purpose. The question is whether his enrichment is "unjust," given all the facts and circumstances.
Unjust enrichment is essentially an equitable doctrine, to be applied where no remedy is available pursuant to contract. SeeBarbara Weisman, Trustee v. Kaspar, 233 Conn. 531, 550,661 A.2d 530 (1995); Ayotte Bros. Construction Co. v. Finney,42 Conn. App. 578, 580-81, 680 A.2d 330 (1996).
This lease contract provides for Mr. Mecca to retain all improvements in the event of a default by Mr. Lanese, and Mr. Lanese clearly defaulted. While he is entitled to damages for Mr. Mecca's fraud, breach of contract and unfair trade practice, I find below[7] that the actions of Mr. Mecca did not excuse Mr. Lanese's default. Therefore, I see no reason why the operative terms of the lease concerning the reversion of improvements to Mr. Mecca should not be given effect.
Since a contract governs the rights of the parties in this regard, a claim of unjust enrichment does not lie.
Mr. Lanese, the plaintiff, has met his burden of proof as regards counts I, II and III of his complaint and not as to count IV.
The Defendant's[8] Claims
1. Count I: Breach of Contract, Nonpayment of Rent
The first count of the defendant's counterclaim claims a breach of the lease in Mr. Lanese's failure to pay rent from March 1993 through January 1994, when Mr. Mecca regained possession via a summary process execution, and from February through July 1994, when he re-leased the premises. That Mr. Lanese failed to pay rent for the months in question is admitted. He offered no evidence of a good reason in law or equity for his failure to do so. There was no evidence that the premises were rendered untenantable by Mr. Mecca's misrepresentation; CT Page 10024 therefore, there was no constructive eviction. See Baretta v. T T Structural, Inc., 42 Conn. App. 522, 526, 681 A.2d 359 (1996).
More to the point, Mr. Mecca's breach of the contract in failing to provide a pollution-free property was not such a "material" breach that it "vitiat[ed] or destroy[ed] the entire purpose for entering into the contract," thereby justifying Mr. Lanese in suspending his own performance by not paying rent while he used the premises to conduct his allegedly successful auto auction and sales business. See Tridex Corp. v. Gorham IslandAssociates, Superior Court, judicial district of Stamford/ Norwalk at Stamford, Docket No. 135246 (December 12, 1994, Lewis, J.). It should be kept in mind that the transaction here was alease, with an option to purchase. While I have found that Mr. Mecca's misrepresentations constituted a fraud, an unfair trade practice and a breach of the lease contract, those findings go to the option portion of the contract only. Despite those misrepresentations, Mr. Lanese was able to conduct his auto auction and sales business successfully in the leased premises from August 1992 through at least October 1993, when he claims he vacated the premises.
Therefore, Mr. Mecca has established his allegations in Count One as to nonpayment of rent for the period through January 1994.[9] Thereafter, when he had regained possession, although "[u]npaid rent . . . may be used by the court in computing the losses suffered by the [defendant] by reason of the [plaintiff's] breach of the lease" (Internal quotation marks omitted.),Rokalor, Inc. v. Connecticut Eating Enterprises, Inc., supra,18 Conn. App. 390, it is also true that he had a duty to mitigate his damages. Id. No explanation was offered for Mr. Mecca's delay for several months in rehabilitating the property for purposes of re-leasing it. Nor was any testimony offered to show diligent efforts to do so. The evidence that was introduced demonstrated that Mr. Mecca's efforts to undo the damage done by Mr. Lanese before and when he moved out did not commence for several months, and I find that he did not do all he could to mitigate his damages from January to July 1994. Therefore, I will award damages, measured by Mr. Lanese's unpaid rent, for a period of three months not the six months sought in the first count of the counterclaim.
2. Count II: Breach of Contract, Unauthorized Use
The lease required Mr. Mecca's written consent to any "change CT Page 10025 or alteration" to the property. No such consent was ever obtained. Though there was conflicting testimony as to how often Mr. Mecca was on the premises while renovations were going on and whether he approved of them or not, in a case such as this, where the testimony is in such conflict and there is no evidence that the parties agreed to alter the terms of their contract, the only prudent way for a court to resolve a dispute is by strict adherence to the terms of the contract agreed upon by the parties.
In this count of his counterclaim Mr. Mecca seeks damages for several ways in which he claims Mr. Lanese used the premises in an unauthorized fashion. In light of the explicit terms of the lease, I find that he has met his burden as to the allegations concerning unauthorized alterations and destruction or removal of property.[10]
 Count III: Negligent Use of the Premises
In this count Mr. Mecca repeats the allegations of Count Two, claiming they also amount to negligent use of the property. The only allegation that qualifies is the one concerning Mr. Lanese's allowing the pipes to freeze when he moved out by not notifying Mr. Mecca so that he could ensure that the heat continued in operation. While the testimony was in conflict on this point, I find Mr. Mecca's account of what happened more persuasive. No reason appears why, if he had been notified that Mr. Lanese was vacating in October 1993, as Mr. Lanese claimed, he would have allowed the property to be unheated, or why he would have commenced a summary process action in November.
Count IV: Negligence; Spilling of Hazardous Waste
Mr. Mecca alleges that Mr. Lanese negligently caused hazardous waste to be spilled onto the premises while he was in possession. No satisfactory evidence was introduced, however, to identify the spills that Mr. Mecca claimed to have found when he retook possession of the property.
Count V: Reckless Use of the Property
In this count Mr. Mecca restates the factual allegations of Counts III and IV, adding the claim that Mr. Lanese acted intentionally or with reckless disregard for Mr. Mecca's property interests. To prove that Mr. Lanese acted recklessly Mr. Mecca CT Page 10026 had to prove that he engaged in "highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." (Internal quotation marks omitted.) Belanger v. Village Pub I, Inc.,26 Conn. App. 509, 513, 603 A.2d 1173 (1992). No evidence was introduced that Mr. Lanese's actions went beyond simple negligence and breach of contract.
Count VI: Unjust Enrichment
Alleging all of the same actions of Mr. Lanese as are alleged in the earlier counts, Mr. Mecca claims that they have led to Mr. Lanese's unjust enrichment. The short answer is that "[u]njust enrichment is a legal doctrine to be applied when no remedy is available pursuant to contract." Ayotte Bros. Construction Co. v.Finney, supra, 42 Conn. App. 581. Mr. Mecca's rights are quite adequately protected by the lease contract here. Therefore, he has no cause in unjust enrichment.
Count VII: Conversion
In this count, too, Mr. Mecca restates all of his previous allegations. "Conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights." DiscoveryLeasing, Inc. v. Murphy, 33 Conn. App. 303, 309, 635 A.2d 843
(1993). To recover in conversion Mr. Mecca would have to have shown that Mr. Lanese's conduct caused him harm. Id. "The measure of damages for conversion . . . is the value of the property at the time of its conversion or loss, with interest from that time." (Internal quotation marks omitted.) Meriden T. S.D. v.H R Litho S. S., Superior Court, judicial district of New Haven at Meriden, Docket No. 243143 (November 18, 1994, Gaffney, J.). In fact, Mr. Mecca ended up with an improved property, which he has re-leased, and the property was improved by Mr. Lanese's efforts. No conversion of Mr. Mecca's property has occurred.
Count VIII: CUTPA
Finally, Mr. Mecca claims that Mr. Lanese's conduct amounts to an unfair business practice. "A majority of [Superior Court] cases support the claim that a simple breach of contract, even if intentional, does not amount to a violation of the Act; a [claimant] must show substantial aggravating circumstances to recover under the Act." (Internal quotation marks omitted.) TheCT Page 10027Production Equipment Co. v. B. Arpaia Chapman, Inc., Superior Court, judicial district of New Haven at Meriden, Docket No. 247485 (January 3, 1996, Silbert, J.). Indeed, in this case the court (Pellegrino, J.) granted a motion to strike a count of Mr. Mecca's third party complaint against his own insurer, holding, inter alia, that "a simple breach of contract is not in and of itself a violation of CUTPA". See file #153.
Whatever aggravating circumstances there were in Mr. Lanese's breach of this contract are adequately redressed in the contract, itself. Other conduct on his part did not go beyond simple negligence, which is not grounds for a CUTPA cause of action in the absence of a finding that his conduct offended public policy or was "immoral, unethical, oppressive or unscrupulous", a finding I cannot make. Cf. A-G Foods, Inc. v. Pepperidge Farm,Inc., 216 Conn. 200, 215, 579 A.2d 69 (1990); Haynes v. Yale-NewHaven Hospital, 243 Conn. 17, 34, 699 A.2d 964 (1997).
In summary, the defendant has met his burden of proof as to counts I, II and III of his counterclaim and not as to counts IV, V, VI, VII and VIII.
Damages
"A plaintiff in a fraud action is entitled to recover any consequential damages resulting directly from the fraud. . . . The damages to be recovered in an action of this character are such as are the natural and proximate consequence of the fraudulent representation complained of; and those results are proximate which must be presumed to have been within the contemplation of the defendant as the probable consequence of his fraudulent representations." (Citations omitted; internal quotation marks omitted.) Kilduff v. Adams, Inc., supra,219 Conn. 323-24. Mr. Mecca should be presumed to have known that Mr. Lanese would make substantial expenditures to renovate the premises, based upon his intention to purchase this property if it was free of hazardous waste. Moreover, had he exercised his option to purchase the property during the lease term, Mr. Lanese would have been entitled to a credit against the purchase price of one-half of his rent payments. Since his intention to purchase was frustrated by Mr. Mecca's misrepresentations, that portion of the rent payments he made from July 1992 to February 1993 is part of his consequential damages. Not a part of those damages are expenditures made by Mr. Lanese that were necessary, whether or not he purchased the property, simply to run his auto auction. CT Page 10028 Chief among these is his cost of advertising while his business was in operation on the property and incidental repairs to the property.
Finally, Mr. Lanese seeks the interest paid on a loan he claims to have taken out to finance improvements on the property. First, no documentation of this loan was ever provided. Second, the terms of the loan had been changed at least once, the testimony showed, with consequent changes in the term and the interest rate, making it impossible to determine what portion of the interest paid is attributable to the funds allegedly borrowed solely to renovate this property. Because of these failures of proof, no recovery will be allowed for this element of the damages claimed.
"In an action founded solely on breach of contract, . . . the recovery of the plaintiffs . . . [is] limited to those damages the defendant had reason to foresee as the probable result of the breach at the time when the contract was made." Neiditz v. MortonS. Fine Assocates, Inc., 199 Conn. 683, 693 n. 3, 508 A.2d 438
(1986). For all of the reasons stated above, I find that the damages described there as recoverable for Mr. Mecca's fraud are also recoverable for his breach of his agreement to provide a pollution-free property.
I have already found that Mr. Lanese has crossed the "ascertainable loss" threshold of CUTPA. "To satisfy the `ascertainable loss' requirement, a plaintiff need prove only that he has purchased an item partially as a result of an unfair or deceptive practice or act and that the item is different from that for which he bargained." Hinchliffe v. American MotorsCorp., supra, 184 Conn. 614-15. He has also presented evidence providing the court with a basis for a reasonable estimate of the damages suffered. Barco Auto Leasing Corp. v. House,202 Conn. 106, 121, 520 A.2d 162 (1987). Therefore, the damages outlined above are independently recoverable under Mr. Lanese's CUTPA count.
Mr. Lanese seeks the punitive damages and attorney's fees recoverable under CUTPA. "[T]o award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights . . . In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence." CT Page 10029 (Citations omitted; internal quotation marks omitted.) Gargano v.Heyman, 203 Conn. 616, 622, 525 A.2d 1343 (1987). I do not find anything in the evidence here that would justify such a finding. Furthermore, Mr. Lanese's conduct in this transaction was not so admirable as to persuade the court to give him the benefit of this extraordinary remedy. See Barco Auto Leasing Corp. v. House,
supra, 202 Conn. 110.
On the claim of attorney's fees, the only evidence introduced was Mr. Lanese's testimony that he had paid two attorneys approximately $5,000 to commence this action. While defense counsel initially objected to this testimony, he withdrew his objection and did not cross-examine Mr. Lanese about his claim. Therefore, this amount only will be allowed.
In connection with Mr. Mecca's damages, as previously stated, he is entitled to the unpaid rent from March 1993 through January 1994, when he obtained an execution on his summary process judgment, and for three months thereafter, which I consider a reasonable time within which he should have readied the property to be re-leased. Pursuant to the lease, he is entitled to "interest at the maximum rate then allowed by law," which is 8%[11], and to a late charge of 10% on each unpaid month's rent, pursuant to the lease. He is also entitled to attorney's fees to enforce the terms of the lease.
In addition, since damages in a breach of contract action "shall place the injured party in the same position as he would have been in had the contract been fully performed," Rokalor,Inc. v. Connecticut Eating Enterprises, Inc., supra,18 Conn. App. 389, and since I have found Mr. Lanese liable under the negligence count of the complaint, I find that the documented expenses incurred to repair the damage done by Mr. Lanese while he was in possession are recoverable under the first and third counts of the counterclaim.
While I have already found Mr. Lanese liable under Count II of the counterclaim, the only evidence of damages arising out of Mr. Lanese's unauthorized alterations and destruction or removal of property is Mr. Mecca's estimates of the value of the items in question and of renovations needed to restore the property to its condition prior to the lease. I do not find that testimony sufficiently reliable to rest an award of damages upon it.
In sum, the damages recoverable by Mr. Lanese on his CT Page 10030 complaint are[12]:
 Major capital expenditures (Excavation, roof repairs, electrical work, construction) $55,456.00
Environmental study 3,989.00
Lost rents (50% of 8 mos. @ $3,000) 12,000.00
Attorney's fees 5,000.00
 $76,445.00
The damages recoverable by Mr. Mecca on his counterclaim are:
 Unpaid rent, March 1993 through April 1994 $55,500.00
Interest (8%) (Jan. 1994-Aug. 1998) 19,980.00
Late charge (10%) 5,500.00
Attorney's fees 1,732.50
Repairs 10,692.00
 $93,404.50
Judgment shall enter for the plaintiff against the defendants on Counts I, II and III of the complaint in the amount of $76,445.00. Judgment shall enter for the defendants on Count IV.
Judgment shall enter for the defendant Mecca Motors, Inc. on Counts I, II and III of the counterclaim in the amount of $93,404.50. Judgment shall enter for the plaintiff on all other counts.
BY THE COURT
Shortall, J.